[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 18, 2002
THOMAS K. KAHN
CLERK

_____

No. 01-15691

_____

D. C. Docket No. 00-00584-CR-1-1-CAP

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

COREY MARTIN,
a.k.a. Corey Milton, etc.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(July 18, 2002)**

Before WILSON, HILL and ALARCON\*, Circuit Judges.

WILSON, Circuit Judge:

Corey Martin appeals the district court's denial of his motion to suppress

_____

\*Honorable Arthur L. Alarcon, U.S. Circuit Judge for the Ninth Circuit, sitting by
designation.

certain firearms, crack cocaine, and marijuana seized as a result of the execution of a state search warrant. The district court found that although the search warrant was not based upon probable cause, the seized evidence is admissible because the *Leon* good faith exception[1] to the exclusionary rule applies. In so finding, the district court took into consideration additional evidence not contained within the four corners of the search warrant. This examination taken by the district court leads us to an issue of first impression in this Circuit: in deciding whether the *Leon* good faith exception applies, may the reviewing court consider facts known to the affiant, but not contained on the face of the affidavit and underlying search warrant? If so, does the *Leon* good faith exception apply in this case?

We agree with the majority of circuits that have examined this issue and find that a reviewing court may look outside the four corners of the affidavit in determining whether an officer acted in good faith when relying upon an invalid warrant. We therefore affirm the district court's holding and agree that the *Leon* good faith exception to the exclusionary rule applies in this case.

BACKGROUND

On May 14, 2000, Atlanta Police Homicide Detective Brett Zimbrick unexpectedly received a telephone call from a man named Sabastian Volataire.

---

[1] *United States v. Leon*, 468 U.S. 897 (1984).

2

Volataire, whose actual name is Troy Terry, had been arrested three days earlier and was being held at the Atlanta pretrial detention facility.[2]  Haunted by his past, Terry decided to come clean and confess to two murders he committed in North Carolina.  Zimbrick asked Terry for details regarding the incident so that he could confirm Terry's story before he met him in person.

And so began Terry's story.  As soon as he was released from prison in Perry, New York, Terry walked across the street, broke into a home, and stole a handgun he found inside.  He then proceeded to Rochester, New York, where he stole a GMC Jimmy truck and traveled down the east coast burglarizing homes, pawning the stolen items, and purchasing crack cocaine.  Specifically, Terry admitted to breaking into the home of Cornelius Ashe in North Carolina and stealing four firearms.  After committing the burglary, he stayed at a nearby campground called Five Springs Campground.  He then wandered over to a flea market where he met two men.  While high on cocaine, the three decided to go fishing.  Paranoid that the two men were going to steal his remaining cocaine, Terry ended up shooting both men at the bank of the river and burying their bodies nearby.  He then left the campground and continued his journey south toward

---

[2] Terry had been arrested for "entering an auto," a misdemeanor under Georgia law.

Atlanta.

Once in Atlanta, Terry sold Ashe's weapons at a crack house/apartment. He received three hundred dollars worth of cocaine for one of the weapons and one hundred dollars for the second weapon. After returning to the apartment the following day, Terry received one hundred and fifty dollars for the other two guns. While smoking the crack he received, Terry loaned the GMC truck to a man named Issac Deloach. Deloach was later arrested in the truck because the truck had been reported stolen. The next day, Terry attempted to steal another vehicle and was subsequently arrested.

During his phone conversation and face-to-face meeting with Zimbrick, Terry continued to provide details regarding his far-reaching crime spree – for example, where the burglaries occurred, what items were taken, that the shell casings from the campground shootings were still in the GMC truck, etc.

Zimbrick attempted to confirm Terry's incredulous story. He verified that Terry stayed at the campground he identified in North Carolina, that Ashe's residence had been burglarized, and that several firearms, as described by Terry, were stolen. He also verified that the GMC truck was recovered on May 10, 2000 from Deloach and determined that the truck had been stolen on April 21, 2000 in Rochester.

4

Terry gave Zimbrick a general description of the location of the apartment where he sold and traded the weapons. A few hours later, Terry pointed out the apartment to two detectives. These detectives subsequently provided Zimbrick with the apartment's address. Based upon Terry's description of the events, including the fact that he had been living in the GMC truck since his stay in Atlanta,[3] Zimbrick believed Terry had only been in Atlanta for a few days before his May 11th arrest. Zimbrick also believed Terry to be reliable – Terry had no money and a crack habit to support, he had no trouble directing the officers to the apartment, and although he was addicted to crack cocaine, he was still in good health, which indicated that he had not been out of custody in New York for a long period of time.

Zimbrick sought a warrant for the apartment, hoping to locate the firearm used in the murders described by Terry. Zimbrick filled out the request for a search warrant and the ensuing affidavit. The items listed on the search warrant to be seized were four handguns and a VCR. The affidavit sets forth the following facts:

> On 05/15/00 Troy Terry initiated contact with the Atlanta Police
> Department and confessed to several crimes that took place outside

---

[3] Zimbrick conducted a visual inspection of the truck and observed items that supported Terry's claim that he had been living in the truck.

5

the City of Atlanta. While taking a taped statement, the suspect admits to taking several weapons from a home in North Carolina and subsequently selling the weapons to the occupants of the listed apartment. Troy Terry directed the Atlanta Police to the specific apartment and personally pointed out the apartment in the presence of the Atlanta Police. It is believed that the weapons that have been verified as stolen out of North Carolina were in fact sold and presently are in the listed apartment.

On May 15, 2000, twelve or fourteen hours after his interview with Terry, Zimbrick sought out Atlanta Municipal Court Judge Andrew Mickle to get approval for a search warrant on both the GMC truck and the apartment. Zimbrick proceeded to Judge Mickle's house because the judges were between court sessions and all the judges were away from the city courthouse at the time. Zimbrick advised Judge Mickle that Terry had confessed to two murders, that Terry traveled down the east coast committing burglaries and selling guns for crack and money, that Terry had been in jail a few days, and that he believed the guns were sold immediately prior to Terry's arrest. Zimbrick then swore to the accuracy of the information in the warrant, and the judge signed it.

Later that day, Zimbrick requested assistance from members of the Atlanta Police Gun Unit and an agent from the Bureau of Alcohol, Tobacco, and Firearms in executing the search warrant issued by Judge Mickle on the apartment described

by Terry, located at 590 Whitehall Terrace, Apartment 4C, Atlanta, Georgia.[4]  The

lessees of the apartment were identified as Johnnie Mann and Lois Jones, who

were both in the living room/kitchen area during the search.  Martin, who indicated

that he rented the bedroom from Mann, was in the bedroom.  After finding a

Taurus 38 caliber pistol and what the officers believed to be crack cocaine and

marijuana in the bedroom, Martin was arrested on weapons and narcotics charges.

Martin was charged with being a felon in possession of a firearm and

ammunition in violation of 18 U.S.C. §§ 922(g) and 924(e).  Martin subsequently

filed a motion to suppress the cocaine and handgun found in the apartment on the

basis that there was no probable cause to grant the search warrant.[5]  Initially, the

federal magistrate judge assigned to the case found that the search warrant did not

establish probable cause and that the *Leon* good faith exception to the exclusionary

rule did not apply based upon the affidavit presented to support the search warrant.

The government objected to the finding that the *Leon* good faith exception did not

---

[4] Zimbrick, the affiant, mistakenly listed 590 Crumley Street as the
apartment location.  According to Zimbrick, the error was due to the detectives'
confusion as to the correct street address to attribute to the apartment.  The
apartment faced Crumley Street, and the only entrance to the building was on
Crumley Street.  Martin, however, takes no issue with the fact that the search
warrant contains the incorrect street address.

[5] Martin eventually pled guilty to both charges while reserving the right to
appeal the district court's denial of his motion to suppress.

apply and requested an evidentiary hearing to supplement the record with information not previously presented to the court.

On March 13, 2001, the magistrate judge held an evidentiary hearing on the matter. Zimbrick testified regarding the information he had obtained prior to seeking the search warrant and the events leading up to the execution of the search warrant. Judge Mickle also testified at the evidentiary hearing. Judge Mickle could not recall whether Zimbrick provided additional information about the case that was not included in the affidavit. In response to an inquiry as to whether he had any doubts about the freshness of the information in the warrant, the judge responded, "No, because I've been signing warrants for Zimbrick for years. I wouldn't expect him to bring me a stale warrant."

With the evidentiary hearing concluded, the magistrate judge found that the facts known to Zimbrick, but not presented in the affidavit in support of the warrant application, could be taken into consideration in determining whether the *Leon* good faith exception was applicable. The magistrate judge then concluded that Zimbrick had a good faith belief that the warrant was based upon probable cause. The district court, adopting the magistrate judge's report and recommendation, found that although the search warrant in this case was not based upon probable cause, the *Leon* good faith exception applied. Thus, the search was

upheld.

On appeal, Martin claims that the district court improperly denied his motion to suppress. Specifically, Martin contends that (1) the magistrate judge should not have considered facts known to the affiant but outside the four corners of the affidavit in order to determine whether the *Leon* good faith exception applied in this case; (2) the warrant was so lacking in probable cause that the detective's belief in it was entirely unreasonable; and (3) the issuing judge [Mickle] abandoned his judicial role and acted as a "rubber stamp for the police."

## STANDARD OF REVIEW

We review de novo the legal issue as to whether the *Leon* good faith exception to the exclusionary rule applies to this search, whereas "the underlying facts upon which that determination is based are binding on appeal unless clearly erroneous." *United States v. Norton*, 867 F.2d 1354, 1360 (11th Cir. 1989).

## DISCUSSION

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Evidence seized as the result of an illegal search may not be used by the government in a subsequent criminal prosecution. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). The exclusionary rule, as it is

known, is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect." *United States v. Calandra*, 414 U.S. 338, 348 (1974). One exception to this exclusionary rule is the *Leon* good faith exception.[6]

*United States v. Leon*, 468 U.S. 897, 922 (1984), stands for the principle that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause. The *Leon* good faith exception applies in all but four limited sets of circumstances. *Id.* at 923. The four sets of circumstances are as follows: (1) where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) "where the issuing magistrate wholly abandoned his judicial role in the manner condemned in" *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979); (3) where the affidavit supporting the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) where, depending upon the

---

[6] Because the government does not contest the district court's ruling that there was insufficient probable cause to justify the search of the 590 Crumley Street apartment, we must assume that the search warrant was issued and executed in violation of the Fourth Amendment.

circumstances of the particular case, a warrant is "so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid." *Id*. (internal quotation marks omitted).

The *Leon* good faith exception requires suppression "only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Id*. at 926. The purpose of the exclusionary rule is to deter unlawful police misconduct; therefore, when officers engage in "objectively reasonable law enforcement activity" and have acted in good faith when obtaining a search warrant from a judge or magistrate, the *Leon* good faith exception applies. *Id.* at 919–20.

Before we can examine whether the *Leon* good faith exception applies in this case, we must determine whether this case fits into one of the four limited sets of circumstances where the *Leon* good faith exception does not apply. Martin argues that two out of the four exceptions to the *Leon* good faith exception apply in this case – specifically, that the warrant was so devoid of probable cause that Zimbrick's belief in its validity was unreasonable and that Judge Mickle wholly abandoned his judicial role in signing off on the warrant.

I.

First, we address whether the affidavit underlying the search warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 923.

To answer this question we look to the face of the particular affidavit at hand in order to determine whether the warrant is so devoid of probable cause that Zimbrick's belief in its validity at the time it was issued was entirely unreasonable. Every affidavit and every set of circumstances leading up to a warrant is unique, and therefore, each affidavit underlying a search warrant should be examined thoroughly for probable cause (or an unreasonable lack of it) on a case-by-case basis. Every warrant must be evaluated to determine what facts are included and what critical information has been left out.

Martin contends that the affidavit is "bare-boned" and contains "nothing more than conclusory allegations" – defects rendering it impossible for the detective to have reasonably relied upon the warrant's validity. *United States v. Glinton*, 154 F.3d 1245, 1257 (11th Cir. 1998) (holding that such affidavits do not satisfy the *Leon* good faith exception); *United States v. Pigrum*, 922 F.2d 249, 252–53 (5th Cir. 1991) (holding the same). The affidavit is said to be "bare-

boned" because it not only lacks specific dates and times to establish the freshness[7] of the information, but also lacks facts connecting the occupants of the apartment to Terry's sale of the stolen guns.

Fortunately, we have guidelines which help us determine what critical information should be included in a search warrant affidavit to establish a finding of probable cause. "It is critical to a showing of probable cause that the affidavit state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." *United States v. Hove*, 848 F.2d 137, 140 (9th Cir. 1988) (As "the affidavit offer[ed] no hint as to why the police wanted to search [the] residence" and why they believed they would find incriminating evidence there and there was no link between the location and the defendant, any official belief that the warrant established probable cause was unreasonable.). "The focus in a warrant application is usually on whether the suspect committed a crime and whether evidence of the crime is to be found at his home or business." *United States v. Procopio*, 88 F.3d 21, 28 (1st Cir. 1996). Thus, the affidavit must contain "sufficient information to conclude that a fair

---

[7] Zimbrick testified that he was initially trained on writing warrant affidavits at the Atlanta Police Academy. He was taught that the information in an affidavit "needed to be fresh" and that information generally "is considered stale after ten days."

probability existed that seizable evidence would be found in the place sought to be searched." *Pigrum*, 922 F.2d at 253.

Specifically, the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity. *See United States v. Marion*, 238 F.3d 965, 969 (8th Cir. 2001).[8] The information in the affidavit must also be fresh. *See United States v. Zimmerman*, 277 F.3d 426, 437 (3d Cir. 2002) (Information indicating that pornography had been located on a computer in the home six months before the search was "stale," and there was nothing that transpired during that time period that would suggest that a "hurried judgment" was made to seek the warrant, which would have excused any reasonable mistake.). If an informant is mentioned in the affidavit, the affidavit must also demonstrate the informant's "veracity" and "basis of knowledge." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). However, "[w]hen there is sufficient independent corroboration of an informant's information, there is

_____

[8] Although the affidavit in *Marion* did not establish a connection between the place to be searched and any criminal activity, the affidavit did connect the defendant to the place to be searched. 238 F.3d at 969. The affidavit also included (1) information provided by an anonymous tipster; (2) the fact that some of that information had been corroborated by independent police investigation; (3) the arrest and search of the defendant and his vehicle; and (4) the defendant's previous drug record. *Id.* The court found that this information in the affidavit was enough to find it was not "so lacking" in probable cause as to make the officer's reliance upon it entirely unreasonable. *Id.*

14

no need to establish the veracity of the informant." *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000).

In this case, we find that the affidavit contains enough indicia of probable cause that Zimbrick's reliance upon the warrant was not entirely unreasonable. The affidavit contains the following several important facts: (1) that a named informant contacted the police and confessed to several crimes that took place outside of Atlanta, specifically taking weapons out of a North Carolina home; (2) that the informant sold those weapons to the occupants of the apartment to be searched; (3) that the informant had personally pointed out the apartment to the police; (4) that the affiant had already verified that the informant had indeed stolen weapons in North Carolina; and (5) that the affiant was applying for the warrant on the same day he received and verified this information from the informant.

The facts set forth in the affidavit sufficiently explain the criminal activity – Terry stole weapons from a home in North Carolina and sold them to the occupants of the 590 Crumley Street apartment. The facts also sufficiently link the criminal activity to the apartment because Terry sold these stolen weapons while inside the apartment.

The affidavit does not specifically link Martin with either the criminal activity or the residence. However, the affidavit does contain Terry's statement

15

that he personally sold the weapons to "the occupants of the listed apartment," as well as Terry's physical description of the occupants, both of which suggest Martin. And in determining whether an affidavit based upon an informant's tips provides a substantial basis for a finding of probable cause, "an 'explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles [the informant's] tip to greater weight than might otherwise be the case.'" *United States v. Sonagere*, 30 F.3d 51, 53 (6th Cir. 1994) (quoting *Gates*, 462 U.S. at 234).

Furthermore, the affidavit indicates that Zimbrick was able to establish Terry's veracity and obtained sufficient independent corroboration of his information. The police were able to verify that the weapons Terry confessed to stealing were in fact stolen out of a home in North Carolina. In *Craig v. Singletary*, 127 F.3d 1030, 1046 (11th Cir. 1997) (en banc), we recognized the significance of the police officers' investigation and corroboration of an informant's tip in determining whether probable cause existed on the basis of an informant's assertions.

Finally, there is some question as to whether the information contained in the affidavit is stale. The only date mentioned is May 15th, the day that Terry initiated contact with the police and confessed to several crimes that took place

16

outside of Atlanta.  However, the fact that Zimbrick applied for the warrant hours

after he received the information from Terry[9] and that Terry was able to lead

officers directly to the apartment where he sold the weapons suggested that the

information contained in the warrant was fresh.

We are not here to determine whether there was sufficient probable cause to

justify the search of the 590 Crumley Street apartment – it is clear that the facts

contained in the affidavit leave much to be desired.  However, despite its

deficiencies as to the specific dates and times and exact links to Martin, we find

that it was *not entirely unreasonable* for Zimbrick to believe that what he wrote in

the affidavit would be sufficient to support a finding of probable cause.  The

affidavit contained sufficient indicia of probable cause to enable a reasonable

officer to execute the warrant thinking it valid.  *See United States v. Hodge*, 246

F.3d 301, 309 (3d Cir. 2001) ("At a minimum, the affidavit was not clearly lacking

in indicia of probable cause, but presented a close call.").

II.

---

[9] The affidavit provides that Terry initiated contact on May 15th, the very same day  Zimbrick presented the warrant application to Judge Mickle.  To be precise, in his supplementary offense report, Zimbrick states that he received a call from the pretrial detention facility that was holding Terry on May 14th at 9:45 p.m., indicating that Terry wished to discuss two murders committed in North Carolina.  The warrant to search the 590 Crumley Street apartment was signed by Judge Mickle on May 15th at 11:35 a.m.

Second, we address whether the issuing judge wholly abandoned his judicial role. *Leon*, 468 U.S. at 923.

Because the issuing judge in this case failed to inquire as to the timeliness of the information or the reliability of the tipster, and because the affidavit was so "glaringly deficient," Martin argues that the issuing judge acted as a mere "rubber stamp" for the police, thereby wholly abandoning his judicial duties. Therefore, according to Martin, this case falls under the second exception and the *Leon* good faith exception cannot apply.

A search warrant must be reviewed by "a neutral and detached magistrate" before it can be executed. *Coolidge v. New Hampshire*, 403 U.S. 443, 450 (1971). This separate review by a member of the judiciary protects us from the sometimes "hurried judgment of a law enforcement officer engaged in the often competitive enterprise of ferreting out crime" and serves as "a more reliable safeguard against improper searches." *Lo-Ji Sales, Inc.*, 442 U.S. at 326. "[T]he courts must . . . insist that the magistrate purport to perform his neutral and detached function and not serve merely as a rubber stamp for the police" in determining whether a warrant contains sufficient probable cause. *Leon*, 468 U.S. at 914.

That being said, the Court in *Leon* was somewhat unclear as to what sort of judicial behavior constitutes abandonment other than describing the unacceptable

18

judicial conduct found in *Lo-Ji Sales, Inc*. In *Lo-Ji Sales, Inc.*, the town justice issued a warrant to search an adult bookstore to seize two obscene films and then accompanied the executing officers on the raid of the adult bookstore where they believed the films were stored. *Id.* at 322–23. The Court held that "[t]he Town Justice did not manifest [the] neutrality and detachment demanded of a judicial officer when presented with a warrant application for a search and seizure." *Id.* at 326. Once the judge became part of the search party in the bookstore, "he was not acting as a judicial officer but as an adjunct law enforcement officer." *Id.* at 327.

The government would have us believe that because the issuing judge in this case took no part in the search he authorized, he did not abandon his judicial role. A number of courts, however, have found that the conduct observed in *Lo-Ji Sales, Inc.* is just one of the ways in which a magistrate judge can fail to act in a neutral and detached manner during the warrant process.

In *United States v. Decker*, 956 F.2d 773, 777 (8th Cir. 1992), the court held that the magistrate judge abandoned his duty to act in a neutral and detached manner when he signed a search warrant without reading it. The judge had relied upon what the police officer told him and did not notice that the warrant did not list the property to be seized and had not been signed by the prosecutor as required by Missouri law. *Id.* at 775.

19

In *United States v. McKneely*, 810 F. Supp. 1537, 1547 (D. Utah), *rev'd*, 6 F.3d 1447 (10th Cir. 1993), the court found that a magistrate judge who had worked closely with police officials for many years issued a search warrant on the basis of the affiant's conclusory statements and did not make an independent review of the facts contained in the affidavit. The judge's close relationship with the police officer "[could] not serve as a substitute for an independent analysis by the magistrate of the grounds supporting the warrant. In other words, good faith on the part of the arresting officer is not enough." *Id.* The Tenth Circuit eventually reversed the district court, finding that we must accord "great deference" to a magistrate judge's determination of probable cause and that there was no evidence in the record to establish an abandonment of neutrality. *McKneely*, 6 F.3d at 1455. However, the case still serves as a reminder that issuing judges should not substitute the police officer's assessment of the facts for the judge's own independent analysis of the situation.

It is clear to us that a magistrate judge should read the warrant and make his own independent assessment as to whether the warrant and its underlying affidavit contain a sufficient amount of information to support a finding of probable cause. A judge can be said to act as a mere "rubber stamp" if he solely relies upon the fact that police officers are asking for the warrant. As Justice Powell explained in

*Shadwick v. City of Tampa*, 407 U.S. 345, 350 (1972), "[w]hatever else neutrality and detachment might entail, it is clear that they require severance and disengagement from activities of law enforcement."

Keeping that in mind, we find that Judge Mickle did not cross the line and wholly abandon his judicial role. Zimbrick testified at the evidentiary hearing that he went over to the judge's house between court sessions and explained to the judge why he was there so early, what he was working on, the fact that Terry confessed to two murders in North Carolina, that the North Carolina authorities were in town, that the bodies Terry spoke of had not been found, that Terry had come down the east coast committing burglaries, that Terry sold the guns for crack and money, that Terry knew what guns he used to murder the two people, and that Terry knew where the individuals were buried. He told the judge that Terry had been in jail for a few days, that he believed that he sold the weapons immediately prior to his arrest, and that Terry had given him a specific apartment where the weapons were located. The judge asked if the contents of the affidavit were true and accurate, then he signed it and handed it back to Zimbrick.

Judge Mickle also testified and explained his typical procedure in reviewing warrants – he claimed that he reads the warrant, swears the officer, and then signs the warrant. Normally, if the judge obtains any additional pertinent information

21

from the officer, he will either ask the officer to write it in or will add a notation in the form of an asterisk at the bottom of the warrant that oral testimony was taken. In this case, there was no notation on the affidavit; however, the judge admitted that it was possible that Zimbrick could have filled him in on some details not contained in the affidavit. When asked if he had any doubts as to the freshness of the information in the affidavit, the judge concluded that he had been signing warrants for Zimbrick for years and he would not expect Zimbrick to bring him a stale warrant.

It is unclear exactly what was said between Judge Mickle and Zimbrick that day concerning the facts contained in the affidavit and underlying search warrant. However, it appears as if Judge Mickle had a conversation with Zimbrick regarding the affidavit and at least read the affidavit (or heard what it contained from Zimbrick) before signing it.

The judge's testimony that he would not expect Zimbrick to give him a stale warrant because he had been signing warrants for Zimbrick for years is troubling, suggesting that Judge Mickle potentially relied upon his past experience with Zimbrick rather than the legal validity of the warrant. "Neutrality and detachment" call for some measure of distance and impartiality to avoid "distort[ing] the independent judgment the Fourth Amendment requires." *Shadwick*, 407 U.S. at

22

350–51. Yet, there is no indication that the judge did not read the affidavit, that he solely relied upon his close relationship with Zimbrick when signing it, or that because it was Zimbrick who was submitting the warrant that that in any way interfered with his independent review of the facts of the case.[10]

With no notation on the affidavit reflecting that additional oral testimony had been given, it is possible Judge Mickle relied upon the facts as seen on the face of the warrant. However, the fact that the judge found these facts sufficient to support a finding of probable cause does not suggest that he wholly abandoned his judicial role. Just because the affidavit is later found to be lacking in probable cause does not mean the magistrate served as a mere rubber stamp. *See United States v. Tagbering*, 985 F.2d 946, 951 (8th Cir. 1993).

---

[10] Compare with the judge's testimony taken in *McCommon v. Mississippi*, 474 U.S. 984, 985–86 (1985) (mem.) (Brennan, J., dissenting):

> Q. So you really issued the search warrant because you were asked for it by two sworn officers of law rather than any particular thing they told you?
> A. Well, I based my decision not primarily on that, but because–if Sheriff Jones walked in there and said, "Judge, I need a search warrant to search John Doe for Marijuana," drugs or whatever–liquor or whatever it might be, I'm going to go on his word because he's– I take him to be an honest law enforcement officer and he needs help to get in to search these places and it's my duty to help him to fulfill that.
> Q. Okay. And it's really based on the request other than any particular thing he might tell you?
> A. That's right. That's right.

III.

Now that we have determined that none of the four exceptions to the *Leon* good faith exception apply in this case, we must make an inquiry as to whether Zimbrick reasonably relied upon the search warrant.

The good faith exception requires the court to consider whether a reasonably well-trained officer would know that the warrant was illegal despite the magistrate's authorization. *Leon*, 468 U.S. at 922 n.23. The question posed here is whether the court, in deciding whether the execution of the search warrant was reasonable, may consider information known to Zimbrick and the other officers that was not presented in the initial search warrant application or affidavit.

Relying upon our prior case law and the case law in other circuits, we find that we can look beyond the four corners of the affidavit and search warrant to determine whether Zimbrick reasonably relied upon the warrant. In *United States v. Taxacher*, we stated that in examining whether the *Leon* good faith exception applies, "we subscribe to a standard which is focused on a reasonably well-trained officer and is based upon the totality of the circumstances." 902 F.2d 867, 872 (11th Cir. 1990); *see also Glinton*, 154 F.3d at 1257; *United States v. Accardo*, 749 F.2d 1477, 1481 (11th Cir. 1985) (As an evidentiary hearing had not been held relating to the officers' conduct and "all the circumstances" had not been

24

considered leading up to the execution of the search warrant, we remanded the case for an evidentiary hearing to be held on the good faith issue.).

In *Taxacher*, we asserted that this standard comports with the language used by the Court in *Leon*, that in determining "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization," "all of the circumstances . . . may be considered." 902 F.2d at 871. The "totality of the circumstances" we considered in *Taxacher* included facts not presented to the issuing judge, such as the fact that the officer consulted with the district attorney prior to seeking the warrant and facts testified to by the officers that were not included in the affidavit. *Id.* at 872–73. We held that, "[a]fter a careful review of all the circumstances, . . . Officer Riner acted in objective good faith and that the warrant was not so lacking in indicia of probable cause as to render official belief in the existence of probable cause entirely unreasonable." *Id.* at 873. While not explicitly saying so, *Taxacher* suggests that facts outside the affidavit should be considered.

In addition, a majority of circuits have taken into consideration facts outside the affidavit when determining whether the *Leon* good faith exception applies. *See Marion,* 238 F.3d at 969 (holding that the officers reasonably relied upon the judge's probable cause determination based upon consideration of information

known to the officers and testified to at the suppression hearing, but which was not included in the affidavit); *Danhauer*, 229 F.3d at 1007 (looking outside the affidavit to consider steps the officer took to investigate the informant's allegations); *Procopio*, 88 F.3d at 28 (noting that information known to the police, but not included in warrant supported application of the *Leon* good faith exception to the exclusionary rule); *United States v. Gahagan*, 865 F.2d 1490, 1498 (6th Cir. 1989) (holding that an officer reasonably relied upon a defective warrant in part because of information known to the executing officer); *United States v. Owens*, 848 F.2d 462, 466 (4th Cir. 1988) (holding that executing officers acted in good faith by relying upon information known outside the four corners of the affidavit to identify the place to be searched); *United States v. Word*, S.D. Ind. 2000, _ F. Supp. 2d _ (No. 99-106-CR-H/F May 31, 2000) (Although reasonable officers could not rely upon the four corners of the warrant to search for drugs, they could reasonably rely upon information known outside of the four corners.), *aff'd*, 7th Cir. 2001, _ F.3d _ (No. 00-2688 Jan. 2, 2001).[11]

---

[11] Martin points to the Ninth Circuit's decision in *Hove*, 848 F.2d at 140, to support his argument that we should only examine the four corners of the affidavit when applying the *Leon* good faith exception. In *Hove*, the court held that when determining whether the good faith exception applies, a court cannot rely upon information possessed by the officer, but not presented to the issuing judge. *Id.*

> An obviously deficient affidavit cannot be cured by an officer's later testimony on his subjective intentions or knowledge . . . . To permit the

In this case, the record indicates that before applying for the search warrant, Zimbrick attempted to corroborate as much of Terry's information as possible. Zimbrick verified that Terry had stolen the GMC truck in Rochester, New York on April 21, 2000; that Terry burglarized the home of Cornelius Ashe in North Carolina; and that specific handguns were removed from the home (the same handguns Terry later claims he sold inside the Atlanta apartment). Zimbrick also confirmed the campground location where Terry claimed he stayed and verified with local police that an individual named Issac Deloach was in fact arrested driving the stolen GMC truck a few days earlier. Zimbrick also examined the impounded, stolen GMC truck to confirm that Terry had "lived" in the vehicle and to verify that certain items had been left inside it. Finally, Zimbrick continued his independent investigation by having Terry personally take two detectives to the

> total deficiency of the warrant and affidavit to be remedied by subsequent testimony concerning the subjective knowledge of the officer who sought the warrant would, we believe, unduly erode the protections of the fourth amendment.

*Id.* The *Hove* court, however, found that the affidavit in that case lacked "any indicia of probable cause" and therefore, determined that an officer's later testimony of his intentions or knowledge could not be taken into account in the face of such a deficient warrant. *Id.* In this case, we also looked at the face of the warrant to determine whether it lacked "any indicia of probable cause" and did not consider Zimbrick's knowledge or intentions. Unlike *Hove*, however, we found sufficient "indicia of probable cause" and can now look beyond the four corners of the affidavit to determine whether the *Leon* good faith exception applies.

apartment where he sold the stolen guns.

Zimbrick also apparently examined the facts before him to determine whether the information he received from Terry was stale. The warrant was sought on May 15th; Zimbrick first had contact with Terry on May 14th. Zimbrick confirmed that Terry had been arrested on May 11th and that the GMC truck had been recovered the day before Terry was arrested. Zimbrick believed Terry had traded the guns for cocaine and/or money on May 9th and 10th or 10th and 11th, because Terry said he currently had no money, no means to support himself, and no job, and he admitted that he was smoking a lot of crack and had run out of things to pawn. Zimbrick believed Terry had exhausted his money and that these events must have happened fairly quickly after leaving jail in Rochester because Terry was still in fairly good health. Moreover, Terry's recollection of the location of the apartment where he sold the handguns was very good, which indicated to Zimbrick that the transaction had been recent.

Under the totality of the circumstances, taking into account the facts known to Zimbrick at the time he applied for the search warrant, we find that Zimbrick reasonably believed that probable cause existed to execute a search warrant. Not only did Zimbrick sufficiently verify Terry's statements before seeking the search warrant, but he also had reason to believe Terry's information was fresh.

28

We must also reiterate that the purpose of the exclusionary rule is to deter unlawful police misconduct. *United States v. Peltier*, 422 U.S. 531, 539 (1975). In this case, Zimbrick did not intentionally omit facts that would have defeated a finding of probable cause. On the contrary, the facts that Zimbrick omitted in his affidavit (i.e., specific dates and times) would have only further supported the issuance of the warrant.

The exclusionary rule is meant to guard against police officers who purposely leave critical facts out of search warrant affidavits because these facts would not support a finding of probable cause. This is not the case here. In fact, the mistakes made were primarily that of the issuing judge who relied, in part, upon past experience with Zimbrick rather than requiring that specific dates and times be included on the face of the affidavit itself. Unless the issuing judge wholly abandons his role (which we have determined he has not), then the officer need not pay for the judge's mistake and the *Leon* good faith exception should apply. *See Leon*, 468 U.S. at 921 ("Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.").

Therefore, we ask ourselves whether a reasonably well-trained officer would have known that the search was illegal despite the judge's authorization and find

29

that the *Leon* good faith exception applies in this case. Zimbrick acted in objective good faith when applying for and executing the warrant. We therefore affirm the district court's decision to deny the defendant's motion to suppress.

AFFIRMED.