[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 22-12023

Non-Argument Calendar

————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

RONELL BERNARD BRYANT, III,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 2:21-cr-14017-AMC-1

————————————————

Before ROSENBAUM, ABUDU, and ANDERSON, Circuit Judges.

PER CURIAM:

Ronell Bryant appeals his conviction for possessing a firearm and ammunition as a convicted felon. *See* 18 U.S.C. § 922(g)(1). Before trial, Bryant moved to suppress the gun and ammunition, challenging the validity and scope of the search warrant that led to their discovery. The district court held an evidentiary hearing and then denied the motion. After careful review, we affirm the denial of Bryant's motion to suppress and his resulting conviction.

## I.

On July 8, 2020, a state judge in Osceola County, Florida, issued an arrest warrant for Bryant for aggravated assault with a deadly weapon, among other offenses, arising from a shooting in May 2020.[1] Believing that Bryant was outside the county, local law enforcement requested assistance from U.S. Deputy Marshal Andy Deacon, the federal warrants coordinator in Fort Pierce, Florida.

Deacon organized a team to execute the arrest warrant at a single-family residence on Avenue K in Fort Pierce, where Bryant's mother lived and where multiple officers had previously encountered Bryant. That address was also listed on the arrest warrant. The arrest team included ATF Special Agent Seth Christy and

---

[1] "When considering a ruling on a motion to suppress, we construe all facts in the light most favorable to the party prevailing in the district court—here, the government." *United States v. Mercer*, 541 F.3d 1070, 1074 (11th Cir. 2008).

Detectives Christopher Jadin and Marc Stotler of the St. Lucie County Sheriff's Office.

On July 9, 2020, the arrest team converged on the residence after officers saw Bryant pull up in a Nissan sedan and park in the driveway next to the house. Jadin approached Bryant, who was sitting in the driver's seat, and conducted an arrest. The passenger, Shaun Cole, was standing outside by the car. Jadin saw that the door of the house near where Bryant had parked was ajar.

Not long after, Bryant's mother arrived on the scene. She notified law enforcement that a child could be inside her house, so Deacon went inside with her to check. They did not see a child, but Deacon saw a Glock handgun in Bryant's mother's bedroom, some firearm paraphernalia in the house, and a box for a handgun in the open closet of another bedroom.

Christy approached Bryant's mother outside the residence, seeking to obtain her consent to search the home for evidence related to the May 2020 shooting. At that time, Christy was recording the events using his cell phone, which he had placed in a chest pocket. Bryant's mother was on the phone when Christy came over, and she was overhead saying that Bryant and Cole "just came in from out of town" after having been gone for "over a week," and that she was "tired of all this bulls—" and had told him "to leave" and not "even come back to this . . . place." After ending the call, Bryant's mother confirmed to Christy that she owned and kept several guns in the house, including a 9mm under her pillow, but she

denied owning any weapon that shot .40 or .380 ammunition, which had been used in the shooting.

Bryant's mother gave consent for a small group of officers to search the house. But first she wanted to get her keys back from either Bryant or Cole. She said, "We literally just left the store. They have my keys. One of them have my keys. . . . So, if you can get my keys, it's got a pink thing. That's my key." She repeated that same point—that Bryant and Cole together had recently obtained her keys—multiple times. She also said that they had her phone, which was found in Bryant's possession.

The officers eventually recovered the keys and returned them to Bryant's mother. Jadin testified that the keys were taken from Bryant's pocket. But it appears he was mistaken about that. Based on Christy's cell phone video footage, the district court found that the officers obtained the keys from Cole.

Christy, Deacon, and Stotler entered the house with Bryant's mother. Christy asked which room was Bryant's, and Bryant's mother responded that he "don't stay here with me," did not "live here," and was "barely here," and instead was staying with his girlfriend. But she agreed with Christy's statement that Bryant "stays here sometimes," and she said he had slept there "over a week ago." She identified one of the rooms as where he slept. A search of that room did not reveal any firearms or personal items belonging to Bryant.

Christy asked to check the caliber of the guns in the house, and Bryant's mother took him first to her bedroom, where the

9mm was located. Meanwhile, Stotler walked into a third bedroom and saw, in an open closet, a Crown Royal bag on a shelf near a box for an FN handgun. Stotler notified Christy and opened the bag, which contained two "AK-47"-style magazines and corresponding ammunition. In that bedroom, the officers also saw men's clothing and equipment consistent with Bryant's music career.

In discussing the firearms she owned or possessed, Bryant's mother initially did not mention an FN gun. She also incorrectly stated that 9mm magazines were in the Crown Royal bag. She later claimed, once Christy mentioned an FN gun, that she previously had owned and sold an FN gun. The FN gun box was significant to Christy and Stotler because they had seen a photo of Bryant, posted to social media a few weeks earlier, with what appeared to be an FN Five-Seven (5.7 mm) handgun in his pocket.

After the consent search, the officers decided to seek a state search warrant. Soon after, Detective Randy Walker of the St. Lucie Sheriff's Office arrived on the scene to draft the warrant affidavit. While writing the affidavit, Walker spoke to and questioned the officers on the scene, including Christy, Deacon, Jadin, and Stotler. These officers did not proofread what Walker wrote, but nothing suggests he inaccurately described what they told him. The details of the warrant affidavit will be discussed in more detail below.

A state-court judge issued a warrant to search the "residence, curtilage, outbuildings, and conveyances, and persons

located on said curtilage" for evidence of the crime of possession of a firearm by a convicted felon, Fla. Stat. § 790.23.  Based on the warrant, officers searched not only the house but also the Nissan sedan that Bryant had parked in the driveway.  Inside a bag in the Nissan's trunk, officers recovered a loaded FN Five-seven handgun and a receipt with Bryant's name on it.

**II.**

Bryant was indicted on one count of possession of a firearm and ammunition after a felony conviction, in violation of 18 U.S.C. § 922(g)(1).  Bryant pled not guilty and moved to suppress the FN gun and ammunition found in the Nissan.  He contended that the search warrant was invalid under *Franks v. Delaware*, 438 U.S. 154 (1978), because of alleged material misrepresentations or omissions in the supporting affidavit, and that the affidavit failed to establish probable cause for the car search.

The district court held an evidentiary hearing and heard testimony from the officers we've mentioned.  The court also viewed Christy's cell-phone video from the scene and reviewed various documents, including the underlying search warrant application and search warrant.

After the hearing, the district court entered thorough findings of fact and conclusions of law denying Bryant's demand for suppression.[2]  The court found that the officers testified credibly in

---

[2] The district court rejected the government's argument that Bryant lacked grounds to challenge the search because he did not have a reasonable expectation of privacy in the residence.  While the government raises that argument

accordance with their good-faith recollections.  And in the court's view, the affidavit did not contain any intentional or reckless misrepresentations or omissions, nor did any inaccuracies or omissions defeat the existence of probable cause.  The court further found that the search of the car was properly within the scope of the probable cause established in the affidavit, and that, even if it wasn't, the good-faith exception applied to prevent suppression.  Bryant now appeals.

## III.

We review the denial of a motion to suppress as a mixed question of law and fact, reviewing findings of fact, including credibility determinations, for clear error and the application of law to those facts *de novo*.  *United States v. White*, 593 F.3d 1199, 1202 (11th Cir. 2010).  Similarly, we review *de novo* whether probable cause existed to support a search warrant, although we "take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers."  *United States v. Gamory*, 635 F.3d 480, 491 (11th Cir. 2011) (quotation marks omitted).

## IV.

Bryant first argues that various falsehoods and omissions in the warrant affidavit require the invalidation of the search warrant.

again on appeal, we see no reason to disturb the court's ruling, given evidence that Bryant was associated with and occasionally stayed at the residence and that he kept personal items there, including music equipment consistent with his occupation as a rap artist.

Search warrants must be supported by probable cause and describe with particularity the place to be searched and the items to be seized. U.S. Const. amend. IV. When the place is a residence, the probable-cause affidavit must establish "a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002).

As a reviewing court, we must ensure that the affidavit "provide[d] the magistrate with a substantial basis for determining the existence of probable cause"—that is, that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983). Because "[a] magistrate's determination of probable cause should be paid great deference by reviewing courts," *id.* at 236 (quotation marks omitted), our approach to reviewing a warrant affidavit must be "realistic and commonsense," not "hypertechnical," *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994).

"An affidavit supporting a search warrant is presumed valid." *United States v. Whyte*, 928 F.3d 1317, 1333 (11th Cir. 2019). Under *Franks*, a defendant may overcome that presumption and obtain suppression of evidence obtained pursuant to the warrant by proving two things: (1) the affiant intentionally or recklessly made misrepresentations or omissions in the affidavit; and (2) absent those misrepresentations or omissions, probable cause would have been lacking. *Franks v. Delaware*, 438 U.S. 154, 171–72 (1978); *United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir. 2009);

*United States v. Novaton*, 271 F.3d 968, 987 (11th Cir. 2001). Even intentional or reckless misrepresentations or omissions will invalidate a warrant only if, after removing the misrepresentations and including the omitted facts, the revised affidavit fails to support a finding of probable cause. *Kapordelis*, 569 F.3d at 1309; *Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1997).

Bryant identifies four categories of alleged misrepresentations or omissions which, in his view, were material to probable cause. We address each category in turn, and then consider probable cause as a whole. Ultimately, we conclude that the district court's findings and conclusions are well-supported by the record, so we affirm the denial of the motion to suppress.

**A.**

First, Bryant disputes the statement in the affidavit that Bryant's mother "informed ATF Special Agent Christy that the residence is hers but her son, Ronell Bryant does stay there and has the keys to the . . . residence." He believes this statement conveyed the misleading impression that he *lived* there, when omitted facts show that his actual connection to the residence "was much more attenuated." He points out that Bryant's mother told officers that he did not "stay" or "live" with her, was "barely" there, and had been out of town for more than a week, that he had a different address listed on his driver's license, and that the keys in question were his mother's, not his own.

The district court reasonably concluded, however, that any inaccuracies or omissions on this point did not suggest that the

officers acted with intentional or reckless disregard for the truth. *See, e.g., United States v. Ventresca*, 380 U.S. 102, 108 (1965) (noting that warrant affidavits are "normally drafted by nonlawyers in the midst and haste of a criminal investigation," and that "elaborate specificity" is not required). The affidavit openly acknowledges that the residence belonged to Bryant's mother. And it presents a simplified but reasonably accurate version of what she told officers at the scene.

Although Bryant's mother claimed that Bryant "barely" stayed with her, she also agreed with Christy that he "stays here sometimes," including just over a week earlier, and she identified a room in the house as where he slept. The court also found that several officers credibly testified about having prior encounters with Bryant at the Avenue K residence, as well as finding Bryant's personal items in the room where the FN gun box was discovered. And even if Bryant did not have his own keys to the house, it's undisputed that he and Cole had obtained his mother's keys just before going to the house. Thus, the record fails to support Bryant's claim that officers attempted to mislead the state magistrate about his connection to the residence.

Second, Bryant asserts that the affidavit falsely stated that he "has the keys to the . . . residence" and "was in possession of the keys to the residence." He notes that officers obtained the keys from Cole, the co-occupant of his vehicle, and that the keys were his mother's, not his own.

The district court reasonably attributed any inaccuracies on this point to unintentional error. The court found that Detective Jadin's observation that Bryant "was in possession of the keys" was inaccurate and that officers obtained the keys from Cole. But after hearing his testimony the court found that Jadin simply made a good-faith mistake, and we see nothing to contradict that assessment and support a finding of clear error. As the court noted, Bryant's mother repeatedly told officers that both Bryant and Cole "together had retrieved the keys from her just before going to the residence." So in that sense, Bryant did have the keys to the residence, even if Cole was physically holding them when officers arrived. Again, the record fails to support Bryant's claim that any inaccuracies or omissions were made intentionally or with a reckless disregard for the truth.

Third, Bryant contends that the affidavit misleadingly omits that Bryant's mother owned the Glock 9mm handgun found in the residence. We disagree. The affidavit notes that the "unsecured" Glock was observed on the bed of the master bedroom, and that Bryant's mother said that the "residence [was] hers" and that she owned and kept several guns in the residence. Thus, the affidavit conveys the reasonably accurate impression that Bryant had access to an unsecured firearm owned by his mother, not that he owned the gun himself.

Finally, Bryant disputes the statement in the affidavit that the AK-47-style magazines were "seen in plain sight." The district court agreed that this statement was inaccurate because the

evidence revealed that the magazines were concealed in a Crown Royal bag.  But, again, the court reasonably attributed this inaccuracy to unintentional error.  The affidavit otherwise reports the undisputed fact that the "FN gun box" was found in "plain sight" in an open closet, next to the Crown Royal bag.  Plus, Bryant does not dispute that the officers were lawfully entitled to look into the Crown Royal bag as part of the consent search.  So while we think these officers should be more careful in the future about the precision of their allegations, we cannot conclude that the magistrate judge clearly erred in finding that this loose language does not suggest intentional or reckless falsity.

## B.

Even assuming Bryant could establish intentional or reckless falsity, we are not persuaded that probable cause would have been lacking absent the alleged misrepresentations and omissions.  *See Kapordelis*, 569 F.3d at 1309; *Madiwale*, 117 F.3d at 1327.  In other words, the revised affidavit, after removing the false statements and including the omitted information, still established "a fair probability that contraband or evidence of a crime will be found" at the residence.  *See Gates*, 462 U.S. at 238–39.

In particular, the revised affidavit established a connection between Bryant, the residence, and criminal activity.  *See Martin*, 297 F.3d at 1314.  It stated that Bryant was arrested for aggravated assault with a deadly weapon while sitting in a car just outside the house, near a partially open side door; that he and his co-occupant Cole had obtained the keys to the house from Bryant's mother; that

Bryant sometimes stayed at the house, including approximately one week earlier, even if he didn't do so regularly; that a gun box for an FN handgun was seen in plain sight in an open closet; that officers had seen a photograph of Bryant in possession of what appeared to be an FN Five-seven handgun; and that Bryant was a convicted felon. We agree with the district court that these undisputed facts establish a fair probability that evidence of Bryant's illegal firearms possession would be found at the residence.

## V.

Bryant also maintains that the search of the Nissan in the driveway of the Avenue K residence exceeded the scope of the warrant. He notes that the warrant affidavit largely concerns the "target house" or the room where the FN gun box was found, and that it does not expressly seek to establish a nexus between the car and the criminal activity.

Bryant's arguments do not warrant suppression. For starters, the search warrant issued by the state magistrate authorized a search of the residence and its "curtilage, outbuildings, and conveyances, and persons located on said curtilage for items and contraband as listed above," which included firearms and ammunition. So the search of the car, as a conveyance within the curtilage of the home, was expressly authorized by the warrant.

We also agree with the district court that the affidavit, while primarily focusing on the house itself, still provided a substantial basis for concluding that probable cause existed to search the car. Given Bryant's arrest from the car, the nature of the arrest warrant

(involving use of a weapon), his apparent recent possession of a FN Five-seven handgun, matching the FN gun box found in the house where he sometimes stayed, and the car's position in the curtilage of the home, the state magistrate reasonably could have concluded that the car would contain evidence of illegal firearms possession.

Finally, any mismatch between the warrant affidavit, the warrant, and the resulting search falls within the scope of the good-faith exception established in *United States v. Leon*, 468 U.S. 897, 922 (1984). The *Leon* good-faith exception "stands for the principle that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause." *Martin*, 297 F.3d at 1313. Suppression is warranted in only four limited circumstances, where it would be objectively unreasonable to rely on the warrant. *See id.*

Here, the officers' reliance on the search warrant was not objectively unreasonable. We have already concluded that the search warrant was not the product of any intentional or reckless falsity in the underlying affidavit. We have also found that there was a substantial basis for finding probable cause to search the Nissan in the curtilage of the home. And Bryant's claim that the state magistrate abandoned his independent judicial role is not only speculative but is inconsistent with those conclusions. *See id.*

Even assuming the warrant affidavit and search warrant should have specifically identified the Nissan as a place to be searched, that does not render the resulting search of the car

unreasonable.  It's undisputed that the Nissan was in the home's "curtilage," the area immediately adjacent to a home which is "considered part of the home itself for Fourth Amendment purposes." *United States v. Taylor*, 458 F.3d 1201, 1206 (11th Cir. 2006) (quotation marks omitted).  And our predecessor court has held that a warrant authorizing the search of an apartment was sufficient to support a search of a vehicle parked in the carport of that apartment, even though the driver was not listed as an occupant of the premises in the warrant. *United States v. Cole*, 628 F.2d 897, 899–900 (5th Cir. 1980).[3]  Given this precedent and other details supporting a connection among Bryant, the car, and the house, Bryant has not shown that it was unreasonable for the officers to believe that the car was properly included in the scope of the search warrant.

## VI.

In sum, we affirm the denial of Bryant's motion to suppress.

**AFFIRMED.**

---

[3] This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).