[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAR 29, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-14709
Non-Argument Calendar

_____

D. C. Docket No. 03-00270-CR-T-N

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TRACY HARRIS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

**(March 29, 2006)**

Before CARNES, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Tracy Harris appeals his conviction for possession of a firearm by a convicted felon, a violation of 18 U.S.C. § 922(g). On appeal, he argues that the district court erred by denying his motion to suppress firearms seized pursuant to a search warrant. Specifically, he argues that (1) the police knowingly or recklessly included false statements in the affidavit for the search warrant; (2) the warrant was not supported by probable cause; and (3) the officers could not have relied in good faith on the warrant. For the reasons set forth more fully below, we affirm the district court's denial of the motion to suppress.

Prior to trial, Harris filed a motion to suppress firearms seized pursuant to a warrant, arguing that (1) the confidential informant used to secure the warrant was unreliable, the information was insufficiently corroborated, and the totality of the circumstances did not indicate a fair probability of finding contraband at his residence; (2) the affiant made material misrepresentations in the application for the warrant; (3) the officers could not have relied in good faith on the warrant; and (4) the evidence could not have been seized under the "plain view" doctrine.

Notably, the government in its response asserted that the information used to procure the warrant was not obtained as the result of an undercover buy, which is why there were no audio recordings, marked money, or post-buy search evidence to back up the confidential informant's statements. The affidavit for the warrant,

2

submitted by Officer Robin Daniels, stated, in relevant part, that:

> He is a deputy with the Crenshaw County Sheriff's Department. That within the past 24 hours he has received information from a confidential and reliable source. The information is that marihuana and cocaine are being sold from and stored at the Harris residence. The source made a controlled purchase of marihuana and cocaine from within the residence. The source has given me information that has led to the recovery of stolen property in the past. The source is reliable. The buy was made in the past 24 hours in the kitchen of the house.

A magistrate issued Daniels a warrant authorizing police to search Harris's residence and seize any marijuana, cocaine, or money that could "be connected to the sale of illegal drugs."

An evidentiary hearing was held before a magistrate judge, and among the issues of concern was whether or not a "controlled buy" had actually occurred, as the affidavit for the search warrant indicated that it had, while the government's brief indicated that it had not. Harris also told the court that he had requested from the government any drugs that were purchased or toxicology reports concerning those drugs, as the government would have that information if the buy was, in fact, controlled. The government indicated to the court that it did not know what happened to the drugs, but that it expected its witness to testify concerning a controlled purchase.

Before any witnesses had testified, the government informed the court that it

3

had just learned that the drugs purchased from Harris's residence were in the custody of the Crenshaw County evidence vault, and could possibly be retrieved by afternoon for the court's inspection. The government then called Crenshaw County Sheriff's Department Investigator Ronnie White, who testified that he had experience and training in conducting controlled drug buys with confidential sources. White testified that he was aware that Harris had a prior felony conviction for a drug offense.

On April 8, 2003, White, along with three other officers, including Robin Daniels, conducted a search of Harris's residence, and White, prior to the search, told the other officers about Harris's prior drug conviction. White and the other officers conducted the search pursuant to a search warrant, the affidavit for which was completed by fellow officer, Daniels. White was present when Daniels made his affidavit for the warrant, and testified that the investigation of Harris began when a confidential informant told the officers that he (the CI) had been involved in receiving stolen property. White said that the CI had been used in other cases, including a case involving the recovery of stolen property and drugs in Crenshaw County approximately a week earlier. The CI's information in that case was accurate, and the CI had never provided untruthful information. Regarding Harris, the CI informed White and Daniels that he and others would occasionally stop by

Harris's residence after committing burglaries and obtain drugs from Harris, using as currency either money or the stolen property.

In response to the CI's information, White and Daniels decided to set up a controlled buy of drugs at Harris's residence. Daniels and White briefed the CI, searched the CI's vehicle and person, and then sent the CI to make the purchase while White and Daniels waited in separate cars on different sides of Harris's residence. The CI later emerged and handed over drugs that he said he had purchased from Harris. White identified the drugs as marijuana and cocaine, and he and Daniels went before a judge to procure a warrant. White then explained that the statement in the affidavit for the search warrant regarding the CI making a "controlled purchase" referred to the CI going into Harris's residence to purchase drugs while being monitored. The CI, however, did not wear any wires or audio transmitters because the sheriff's department, being in a "small," "poor" county did not have any such equipment. The department also did not have any video surveillance equipment.

Accompanied by other officers, White helped to execute the search warrant, and he testified that the search of Harris's residence was quite extensive and covered the entire residence because of how easy it was to hide narcotics. The search found no drugs or money, and White testified that, at the time he and

5

Daniels went to a judge for a search warrant, they had no information as to what, if any, stolen property was at Harris's residence; therefore, the search warrant did not mention stolen property. However, a chainsaw, a Remington shotgun, and a Remington rifle were all found by Daniels in a bedroom closet. An inventory sheet was left at Harris's residence, and shortly thereafter, Daniels and White, responding to a call that Harris had been located at a Dollar Store, went to the store and arrested Harris "for receiving stolen property on the shotgun." When Officer Daniels first approached Harris, he read him his Miranda rights, and after those rights had been read, Daniels informed Harris that he had found stolen property at Harris's residence, prompting Harris to say that there was nothing stolen in his house except the shotgun.

On cross-examination, White admitted that he had insufficient information, based on the CI's tip, to get a search warrant for stolen property and that many of the items seized from Harris's residence, such as a TV, a VCR, and some videogame consoles, were taken based on the belief (later shown to be erroneous) that they constituted stolen property traded for drugs. As to the controlled buy, White stated that the preferred method was to watch the CI make the purchase, but that in this case, it was impossible to do, and, therefore, no one actually saw the purchase take place. Despite the fact that the police gave the CI money to make

6

the purchase, White testified that the money was not marked, recorded, or retrieved. After entering Harris's residence, the CI returned to White's vehicle and handed White a bag with a small amount of cocaine and a marijuana cigarette.

White further testified that, in addition to having no video or audio recording of the controlled buy, there was no completed report regarding the buy. Furthermore, the affidavit for the search warrant did not state from whom the drugs were purchased despite the fact that Harris had a roommate, nor did the affidavit mention that the substances had been tested to determine whether they were in fact narcotics. As to the guns, White testified that Daniels found them in a bedroom closet along with hunting apparel.

Harris then called Officer Robin Daniels, who had applied for the search warrant at issue in the case. Daniels testified that he applied for a warrant to search Harris's single-wide mobile home, also occupied by another person, and that the affidavit for the warrant was all in his handwriting with the exception of the line, "The buy was made in the past 24 hours in the kitchen of the house," which was written by the magistrate judge who issued the warrant.

Daniels testified that a confidential informant had indicated that he had been able to obtain marijuana and cocaine from Harris's residence, and that Daniels's affidavit for the warrant stated that the informant had provided reliable information

7

leading to the discovery of stolen property on another occasion. The informant's tip about Harris occurred a few days before the search of Harris's residence, and Daniels corroborated the location of Harris's residence by having the informant point out the location on a drive-by. Daniels then set up the controlled purchase, although he did not accompany the informant to Harris's residence. However, none of the officers involved in the organization of the purchase were physically present at the location of Harris's residence at the time of the purchase. Daniels testified that he was 3/4 of a mile away at a store, while White was located a little closer to the residence on a county road. Another officer joined White on the same county road, but further from the residence than either Daniels or White. Daniels confirmed that the informant and the informant's car were both searched prior to the purchase, and police had provided the funds used to make the purchase.

Daniels also testified that the CI had made another controlled purchase that same day at a different residence and in an unrelated case, conducted in the same way as the one at Harris's residence. Prior to the purchase at Harris's residence, the CI was debriefed on the other purchase, and the officers conducted another search of the CI's person and vehicle to make sure he had not picked up a weapon or anything else. Daniels testified that the CI was joined by his girlfriend on the purchase at Harris's residence, but that the girlfriend was also searched before and

8

after the purchase. Daniels did not know whether the girlfriend had accompanied the CI into Harris's residence. The CI conveyed to Daniels that he had purchased a small amount of marijuana and cocaine from a person identified only as a black male. Thus, Daniels admitted that he did not know whether Harris was present at his residence at the time of the purchase. No analysis was done of the seized drugs.

As to the search itself, Daniels testified that the warrant authorized him to seize any marijuana, cocaine, or money connected as drug proceeds. No marijuana, cocaine, money, or drug paraphernalia was seized, but the inventory sheet from the search reflected that numerous appliances and electronics were taken based on the CI's assertion that stolen goods were traded for drugs. Daniels also found a Remington shotgun and rifle in a bedroom closet and obtained the serial numbers after removing a few live rounds from the rifle. He searched the closet to ensure that no one was hiding inside, as well as to check for any drugs that might be hidden. After obtaining the serial numbers, Daniels ran a check on the firearms, left Harris's residence, and proceeded to the Dollar Store, where he read Harris his Miranda rights and arrested him. Daniels told Harris that he wanted to talk to him about some stolen property, prompting Harris to mention something about the shotgun.

9

The court questioned Daniels about his interactions with the magistrate who issued the warrant, and Daniels could not recall any specific information he gave regarding how he knew that Harris was the owner of the residence to be searched. As for the line in the affidavit written by the judge, Daniels testified that the issuing magistrate asked a lot of questions and routinely would remove or add lines to warrants based on the responses.

On cross-examination, Daniels reiterated that the reason he believed the informant to be credible was that he had provided law enforcement with accurate and detailed information in other investigations, one in another county regarding burglaries, and the other in Crenshaw County regarding the location of stolen property. Daniels also admitted that he knew, at the time of the search, that Harris previously had been convicted of a felony. In particular, Daniels had been told that Harris had spent time in jail for drug charges. Daniels also identified (as Government Exhibit 5) the marijuana and cocaine purchased by the informant from Harris's residence, although he could not recall whether the drugs had been field tested. Notably, the bag containing the drugs from Harris's residence also contained drug evidence seized from another location that same night. When asked why none of the officers accompanied the informant into Harris's residence to make the controlled buy, Daniels testified that, because of the small size of the

10

county, he thought any of them would have been recognized. Daniels was also asked why he considered the CI's purchase a controlled buy, and he responded that, in his opinion, it would have been viewed that way by the judge because the police provided the money, searched the CI, and had a specific place in mind. Daniels later testified that the bag containing the drugs (exhibit 5) contained no notations as to where the bag came from or the date on which it was received.

The court then questioned Daniels about the warrant process, specifically about why none of the evidence about the CI's reliability to which Daniels testified was included in the affidavit used to support the warrant, and Daniels testified that the magistrate who issued the warrant had, in the past, stricken overly detailed explanations of why an informant should be considered credible. Thus, Daniels wrote out his warrant application beforehand and, after he submitted it to the magistrate, had a detailed conversation about the informant's reliability rather than writing it all on the application. The court explicitly asked Daniels how it was supposed to know that Daniels had communicated to the magistrate all of the testimony he had given to confirm the reliability of the informant prior to April 8, 2003, the date of the warrant, and Daniels replied that his testimony was what he remembered and "that was really just the way things worked" with that particular magistrate.

11

Daniels further testified that, after the guns had been found, a NCIC[1] check of the serial numbers revealed the shotgun had been stolen, giving him probable cause to arrest Harris. Upon arrival at the Dollar Store just down the road from Harris's residence, another deputy pointed Harris out to Daniels, who then proceeded toward Harris and read him a Miranda warning in order to question him about the suspected stolen shotgun. After reading Harris his rights, Daniels arrested him for receiving stolen property, a violation of state law. Harris was later convicted on the charge.

A magistrate issued a report finding that, assuming arguendo that the affidavit on its face was insufficient to support probable cause, the officers, especially in light of their detailed discussion with the issuing magistrate, relied in good faith on the search warrant's probable cause determination, making the search legal. As to the plain view seizure of the guns, the court found that the officers were authorized to seize the guns because, armed with undisputed evidence that Harris was a convicted felon, the guns were immediately incriminating. It further found that the officers were authorized to open the closet door to search for hidden drugs. Thus, it was recommended that the motion to suppress be denied.

Harris objected to the report, first arguing that it failed to take into account

_____

[1] National Crime Information Center. NCIC is a computerized index of criminal justice information operated by the FBI.

the separate and distinct theories for invalidating the warrant. Specifically, Harris argued that the magistrate did not sufficiently address his argument that no controlled buy took place, and, therefore, that the affidavit for the search warrant was deliberately misleading, rendering the search warrant void. Harris then reiterated his argument that the good faith exception did not apply in this case. Next, Harris argued that, because the officers could not legally be in his residence, the plain view doctrine was inapplicable. In any event, he argued that the officers exceeded the scope of the warrant by searching for stolen property, and that the incriminating nature of the guns was not immediately apparent until after the guns were seized and the serial numbers run. Harris stated that, had the officers truly believed that he was a convicted felon, it should have been included in the warrant, and then the guns could have been seized as evidence of a federal crime without having to run the serial numbers through NCIC.

The district court, after reviewing the report and the objections, adopted the magistrate's report and overruled Harris's objections. Harris then entered a conditional plea of guilty, reserving his right to appeal the motion to suppress and withdraw his plea if he prevailed on appeal. The court accepted the plea agreement, and later sentenced Harris to 28 months' imprisonment.

On appeal, Harris argues that the "bare bones" affidavit submitted by law

enforcement in this case failed to establish the veracity, reliability, and basis of knowledge of the informant who supplied information regarding drug activities at Harris's residence. Furthermore, he argues that the Leon good faith exception does not apply because in this case (1) the affidavit supporting the warrant was so lacking in any indicia of probable cause that official belief in its existence was entirely unreasonable; (2) law enforcement was reckless in preparing the affidavit; and (3) the magistrate was misled by information that law enforcement knew was false or in reckless disregard of the truth. Specifically, Harris argues, as he did below, that the "controlled purchase" referred to in the affidavit for a warrant was not actually controlled, making the statement false. Harris also argues that the search warrant in this case was illegally issued because it was based on an intentional misrepresentation regarding the controlled purchase of drugs in violation of Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

## I. The Probable Cause Affidavit and Warrant

"A district court's ruling on a motion to suppress presents a mixed question of law and fact." United States v. Zapata, 180 F.3d 1237, 1240 (11th Cir. 1999). We accept the district court's findings of fact to be true, unless shown to be clearly erroneous, and review the district court's application of the law to those facts

14

de novo. Id. "[A]ll facts are construed in the light most favorable to the prevailing party below." United States v. Bervaldi, 226 F.3d 1256, 1262 (11th Cir. 2000). "The individual challenging the search has the burdens of proof and persuasion." United States v. Cooper, 133 F.3d 1394, 1398 (11th Cir. 1998).

The Fourth Amendment provides for the right to be free of unreasonable searches and seizures, and mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. "Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999) (citation omitted). Furthermore, probable cause "is a fluid concept--turning on the assessment of probabilities in particular factual contexts[.]" Id. citing Illinois v. Gates, 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983). This Court affords "great deference" to a lower court's determination of probable cause. Brundidge, 170 F.3d at 1352.

As we have noted:

Under the Gates totality of the circumstances test, the 'veracity' and 'basis of knowledge' prongs . . . for assessing the usefulness of an informant's tips, are not independent. '[T]hey are better understood as relevant considerations in the totality of the circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for . . . by a strong showing as

15

to the other[.]'

Id. at 1352-53. At the outer limits of probable cause determinations involving a close call, we have held that, in addition to independently corroborating an informant's facts, creating circumstances where the informant is unlikely to lie can also corroborate the informant's tip. See United States v. Foree, 43 F.3d 1572, 1576-77 (11th Cir. 1995) (upholding search warrant where a substantial basis supported the magistrate's finding of probable cause, especially in light of the fact that "the CI was unlikely to be untruthful, for, if the warrant issued, lies would likely be discovered in short order and favors falsely curried would dissipate rapidly.").

As for Harris's Franks challenge to the veracity of Daniels's statements regarding a "controlled buy" set forth in the affidavit underlying the search warrant, we have held that if, after an evidentiary hearing has concluded:

> the allegation of perjury or reckless disregard [of the truth] is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

United States v. Novaton, 271 F.3d 968, 986 (11th Cir. 2001), citing Franks v. Delaware, 438 U.S. 154, 156, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978).

16

Turning first to the issue of whether a material and deliberate misrepresentation was made to the issuing magistrate in violation of Franks, Harris's focus is on the statement in the affidavit that there was a "controlled purchase" made by a CI, something he argues never happened based on the officers' testimony presented at the hearing. Specifically, Harris points to the fact that there was little, if any, control exerted over the buy. It is true that the testimony established that there was no video or audio surveillance, and, in fact, the police were not physically present on the premises, but rather were positioned in vehicles nearby and none of the officers actually saw or heard the purchase take place. Furthermore, while the officers in this case provided the CI money to make the purchase, it was not marked or recovered from Harris's person or residence. Moreover, the small bag of drugs purchased by the CI was not dated or marked to indicate when and where they were retrieved, nor was any analysis done to verify the substances.

However, there was also testimony that the CI's car, person, and girlfriend were all searched before and after the purchase, and the CI turned over the drugs very soon after making the purchase. Whatever the shortcomings of the Crenshaw County Sheriff Department's "controls" for making controlled purchases, taking the facts in a light most favorable to the prevailing party, the testimony of Officers

17

White and Daniels demonstrated that they honestly believed that the CI had made a controlled purchase of drugs from Harris's residence. White's testimony was that, while the preferred method for a controlled buy was to physically watch the CI make the purchase, it was not possible to do so in this case. Despite the lack of audio or video surveillance equipment, White still explained that the CI was monitored (although he did not explain how), which is why the affidavit for the search warrant mentioned the "controlled purchase." Daniels's testimony echoed a belief that, by searching the informant and his car prior to making the purchase and providing him the money to buy drugs, the purchase was controlled.

Taking the facts in a light most favorable to the prevailing party, the government, it cannot be said that Daniels's statement in the affidavit that a "controlled purchase" had taken place constituted a deliberately false statement or a statement made in reckless disregard of the truth, such as is required for the affidavit to be set aside under <u>Franks</u>. The fact that the officers' definition of a "controlled purchase" is perhaps not as stringent as the one Harris might hope for does not mean that the officers were deliberately lying when they testified that they believed the purchase to be a "controlled" one. As such, we conclude that Harris's <u>Franks</u> challenge does not warrant a reversal.

Turning next to the issue of whether the affidavit was sufficient to establish

probable cause, it is a close call. The face of the affidavit itself states only that (1) information was received from an informant within the past 24 hours that drugs were located and sold in the Harris residence; (2) a controlled purchase had been made from within the residence; (3) the source had in the past provided information leading to the recovery of stolen property; and (4) the buy was made within the past 24 hours in the kitchen of the house. However, the last line of the affidavit was not even written by Officer Daniels, but rather by the magistrate judge who issued the warrant. The warrant does not describe in much detail why the informant was considered reliable, nor does it describe when and what the informant provided in the way of information that led to the recovery of stolen property. Furthermore, the details of the "controlled purchase" are left out entirely until the magistrate himself wrote in the final line, and Daniels does not indicate that the informant's information was in any way corroborated. However, we decline to address whether the warrant in this case lacked probable cause because assuming, arguendo, that the affidavit failed to establish probable cause on its face, the testimony at the hearing regarding the discussions between Officer Daniels and the issuing magistrate are sufficient to establish a good faith reliance on the warrant, as discussed below.

## II. The Leon Good Faith Exception

19

We review "de novo whether the Leon good faith exception to the exclusionary rule applies to a search, but 'the underlying facts upon which that determination is based are binding on appeal unless clearly erroneous.'" United States v. Robinson, 336 F.3d 1293, 1295 (11th Cir. 2003).

As we have held, "[e]vidence seized as the result of an illegal search may not be used by the government in a subsequent criminal prosecution." United States v. Martin, 297 F.3d 1308, 1312 (11th Cir. 2002). "The exclusionary rule, as it is known, is 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" Id. One exception to the exclusionary rule is the so-called "good faith" exception set forth by the Supreme Court in United States v. Leon, 468 U.S. 897, 922, 104 S.Ct. 3405, 3420, 82 L.Ed.2d 677 (1984). Martin, 297 F.3d at 1312.

The Leon exception "stands for the principle that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause." Martin, 297 F.3d at 1313. "The Leon good faith exception requires suppression 'only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.'" Id. "The purpose of the exclusionary rule is to deter

20

unlawful police misconduct; therefore, when officers engage in 'objectively reasonable law enforcement activity' and have acted in good faith when obtaining a search warrant from a judge or magistrate, the Leon good faith exception applies." Id. Moreover, we have held that we "can look beyond the four corners of the affidavit and search warrant to determine whether [the officer] reasonably relied upon the warrant." Id. at 1318.

The Leon exception applies in all but four circumstances, three of which Harris asserts apply in the present case: (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role; and (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Id. at 1313.

As discussed above, Daniels's affidavit was not, based on his testimony, knowingly false, nor can it be said that any alleged falsity would have been known absent a reckless disregard of the truth. Moreover, while the testimony in this case outlined an unusual procedure for securing a search warrant, Daniels testified under oath that the magistrate issuing the warrant in this case previously had stricken overly detailed information regarding the credibility of informants and

21

instead had detailed conversations with him regarding reliability. This same magistrate routinely would remove or add lines to affidavits or warrants based on those conversations. During their conversation, which took place somewhere near midnight, Daniels told the magistrate about how the CI had provided reliable and accurate information within the past week regarding the location of stolen property in another county as well as in Crenshaw County, and that the informant had tipped him off regarding the sale of drugs and trading of stolen property for drugs at Harris's residence. Officer White's testimony confirmed the details regarding the CI.

After hearing these details not specifically outlined in Daniels's affidavit, the magistrate added a line about the "controlled purchase" having taken place within 24 hours, presumably because he believed the information was true and provided him with greater assurance that the probable cause standard had been met. In light of the detailed questioning done by the magistrate, the evidence taken in a light most favorable to the government does not show that the magistrate wholly abandoned his role by issuing the warrant, although his practice for issuing the warrant seems unorthodox.[2] The evidence demonstrated that the magistrate took a

---

[2] Harris does not argue that the magistrate abandoned his role or was not neutral, but rather that the magistrate was misled by Daniels. The argument, therefore, is deemed abandoned. United States v. Cunningham, 161 F.3d 1343, 1344 (11th Cir. 1998).

lot of time to discuss the reliability of the informant and the facts surrounding the application for the warrant before deciding that an additional line was needed, and before the warrant should issue. There is simply no evidence that the magistrate simply rubber-stamped the officers' application.

Moreover, the affidavit was not so lacking in any indicia of probable cause that no reasonable official would rely on the warrant. The warrant itself was based on information that Daniels believed to be reliable based on his prior dealings with the informant, and Daniels set up and had knowledge of the "controlled buy" of drugs from Harris's residence. Furthermore, the evidence demonstrated a reasonable reliance on the warrant based on Daniels's objective (and nearly first-hand) belief that the informant had purchased drugs from Harris's residence during a controlled buy. Based on the informant's first-hand purchase of the drugs from Harris's residence within 24 hours of the warrant's issuance, it cannot be said that it was objectively unreasonable for Daniels to believe that there was a "fair probability" of finding contraband in Harris's residence. Brundidge, 170 F.3d. at 1352 ("[p]robable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location."); see also Gates, 462 U.S. at 235, 103 S.Ct. at 2330-31 (recognizing that affidavits "are normally drafted by

23

nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleading have no proper place in this area."). Accordingly, the affidavit had more than an indicia of probable cause and it was not unreasonable for Daniels to rely on the warrant. Moreover, going beyond the four corners of the affidavit (as we may), Daniels's reliance was reasonable given the in-depth discussion of the informant and the warrant with the magistrate judge, who only issued the warrant after questioning Daniels extensively on the subject.

Harris cites to a Sixth Circuit case, United States v. Weaver, 99 F.3d 1372, 1380-81 (6th Cir. 1996), in support of his argument that the Leon exception should not apply because reliance on the warrant was unreasonable. However, Weaver is unpersuasive here, as in Weaver, the officer:

> [P]ossessed some information from a previously reliable informant regarding possible criminal activities but 1) possessed no prior personal knowledge of any unlawful activity by this suspect, or at the suspect residence, other than an old conviction on completely unrelated circumstances; 2) possessed no present personal knowledge of any connection between this suspect and marijuana possession or distribution; 3) had not personally seen any marijuana at the suspect residence nor conducted any visual reconnaissance of the property to determine whether marijuana was likely to be present on the property; and 4) possessed only third-party hearsay information about a possible marijuana grow operation on the property.

Weaver, 99 F.3d at 1380. On the basis of these facts, the court concluded that the

24

officer, with "little firsthand information and no personal observations . . . should have realized that he needed to do more independent investigative work to show a fair probability that this suspect was either possessing, distributing, or growing marijuana." Id.

In the present case, however, Daniels, according to his testimony, did not rely on just the information of the informant.  Instead, Daniels conducted a drive-by of the residence with the informant to confirm the location, and then set up a controlled purchase in which the informant would buy drugs at the location.  Only after the informant had successfully obtained drugs, which Daniels took into evidence, did he attempt to get a search warrant for Harris's residence.  This was not a case where Daniels simply took an informant's word at face value, but rather required the informant to successfully conduct a controlled buy to verify the information prior to securing a warrant.

Thus, unlike in Weaver, Daniels sought some corroboration of the informant's tip about drug sales at Harris's residence, and used that information, however inartfully described and expressed in the affidavit, to secure a warrant.  Taken in a light most favorable to the government, Daniels did corroborate the information originally provided by the informant by setting up a controlled buy.

In conclusion, while the affidavit in this case may have lacked sufficient

25

indicia of the informant's reliability on its face, and the controlled buy left something to be desired, we conclude that the evidence, taken in a light most favorable to the government, supports the conclusion that Daniels was not dishonest or recklessly disregarding truth when he asserted that a controlled buy had taken place, did not deliberately mislead the magistrate (who also did not abandon his role), and Daniels's belief that probable cause existed was not so objectively unreasonable as to warrant exclusion of the seized evidence in light of Leon's good faith exception. We, therefore, find no reversible error and affirm.

**AFFIRMED.**