[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 8, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-14407
Non-Argument Calendar

_____

D. C. Docket No. 07-00035-CR-4-SPM-WCS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JEREMIAH TYRONE SAILOR,
a.k.a. Cuz,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(December 8, 2009)

Before BLACK, HULL and PRYOR, Circuit Judges.

PER CURIAM:

After a jury trial, Jeremiah Tyrone Sailor appeals his drug and firearm convictions and sentences. After review, we affirm.

## I. BACKGROUND

### A. Controlled Drug Buy

This case arises out of a joint task force investigation conducted by the Drug Enforcement Administration ("DEA") and the Florida Department of Law Enforcement ("FDLE"). Because Sailor challenges the search warrant and the sufficiency of the evidence at trial, we review the procedural events and evidence in detail.

On April 30, 2007, Jesse Chambers was arrested for selling cocaine base to a confidential source. Chambers cooperated with the task force and identified Defendant Sailor as his cocaine supplier. Earlier that day, Chambers was in Sailor's apartment to purchase drugs.

Two days later, on May 2, 2007, Chambers arranged, via a cell phone, to purchase cocaine from Defendant Sailor. Chambers conducted a controlled buy of cocaine from Sailor at his apartment F-19 on Jackson Bluff Road. Later, Defendant Sailor was arrested in his car after he drove away from his apartment. Investigators found on Sailor marijuana, some cell phones used to arrange the drug

2

deal, $1,764 in cash including $900 in recorded bills used in the controlled buy, and keys to the F-19 apartment.

## B.    Search Warrant

On May 2, 2007, less than two hours after the controlled buy, DEA Special Agent James Harley submitted an application for a warrant to search Sailor's apartment F-19 at 1834 Jackson Bluff Road in the Casa Cortez apartment complex. The application included Agent Harley's sworn affidavit stating that, based on the controlled buy, he believed there was a high probability that crack cocaine and evidence of drug trafficking would be found at the apartment.

Agent Harley's affidavit recited these facts: (1) on May 2, 2007, investigators equipped an FDLE confidential source ("CS")[1] with a listening and recording device and provided the CS with $1,000 in DEA funds; (2) the CS, the vehicle in which the CS was riding and the driver of the vehicle were searched for "illegal contraband" before the controlled buy; (3) the CS's vehicle was "continuously followed" by investigators to the apartment; (4) investigators observed the CS exit the vehicle and "walk[ ] toward the F building"; (5) a few minutes later investigators observed the CS exit apartment F-19 and enter the CS's vehicle; (6) investigators "continuously followed" the CS to a neutral location

---

[1]The confidential source was Chambers. Because Agent Harley's affidavit did not identify Chambers, our summary of the affidavit's contents refers to Chambers as the "CS."

3

where the CS gave investigators approximately an ounce of cocaine and two grams of crack cocaine, which field-tested positive for cocaine; (7) in a subsequent debriefing, the CS stated that he entered the apartment and purchased cocaine and crack cocaine from Sailor for $900, that Sailor had a box in the kitchen with approximately 17 to 18 ounces of cocaine and that, within the past year, the CS had observed Sailor in the apartment with a firearm; (8) city utility records indicated that the apartment had been listed in Sailor's name since October 12, 2006; and (9) the apartment's address was the address on Sailor's driver's license.

After obtaining the warrant, investigators searched the apartment and found powder and crack cocaine, a bullet proof vest, two firearms and ammunition, scales, small "Ziploc" baggies, tally sheets and ledgers, paraphernalia for converting powder cocaine to crack and over $10,000.

## C. Indictment

A federal grand jury indicted Defendant Sailor for (1) conspiracy to distribute, possess with intent to distribute, and manufacture more than 5 kilograms of cocaine and more than 50 grams of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii) and (iii), and 846 (Count 1); (2) distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) (Count 2); (3) possession with intent to distribute more than 500 grams of cocaine and more than 5 grams of cocaine

4

base, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(ii) and (iii) (Count 3); and (4) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count 4); and (5) possession of a firearm or ammunition by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(e) (Count 5).

## D. Motion to Suppress and Suppression Hearing

Sailor moved to suppress the evidence seized at his apartment. Sailor contended, inter alia, that Agent Harley's affidavit had given false information and omitted key facts; that the CS actually bought the drugs from John Austin, not Sailor; that the recording device had failed, which left no corroboration for the CS's testimony; and that the CS was unreliable.[2]

The district court held a hearing on Sailor's motion.[3] At the outset, Agent Harley's affidavit was introduced as evidence and established, as outlined in more

---

[2]Attached to Sailor's motion to suppress was, inter alia: (1) a DEA investigation report by Tallahassee Police Office David Donato indicating, inter alia, that while monitoring the May 2, 2007 controlled buy investigators heard a male voice and a female voice that "sounded to be on a speaker phone . . . . arguing about money"; (2) an affidavit in support of a state criminal complaint, also by Officer Donato, indicating, inter alia, that the CS told investigators after the controlled buy that a male named John opened the door to the apartment "and allowed the source to enter but did not have any other involvement in the transaction"; and (3) an FDLE "rapsheet" for John Austin listing, inter alia, a 2000 Florida conviction for third degree felony cocaine possession.

[3]In its order denying the motion to suppress, the district court noted that Defendant Sailor did not officially cite Franks v. Delaware, but the substance of Sailor's argument was a Franks challenge. See Franks v. Delaware, 438 U.S. 154, 155-56, 98 S. Ct. 2674, 2676 (1978) (concluding Fourth Amendment is violated if a warrant is obtained by using false statements made intentionally or recklessly that are essential to probable cause finding and that defendant is entitled to an evidentiary hearing if he makes a "substantial preliminary showing").

detail above, that during a May 2, 2007 controlled buy monitored and recorded by investigators, a CS purchased cocaine and crack cocaine from Defendant Sailor at apartment F-19, which was leased by Sailor. According to the affidavit, investigators searched the CS and his vehicle, continuously followed the CS to and from the apartment complex, observed the CS walk toward building F and, a few minutes later, exit apartment F-19 and return to his vehicle. Afterward, the CS gave investigators cocaine and crack cocaine he said he purchased from Defendant Sailor in the apartment for $900.

In an attempt to show that Agent Harley's affidavit contained material omissions and misrepresentations, defense counsel called Agent Harley and FDLE Officer Tonja Bryant-Smith as witnesses. Agent Harley first testified that he met Chambers, the CS, on April 30, 2007, at which time Chambers was facing federal drug charges. Agent Harley had never used Chambers as a source before.

During the controlled buy, Agent Harley listened on the monitoring equipment, but could not see apartment F-19. Agent Harley heard what sounded like a drug transaction. Agent Harley admitted hearing a male voice and a female voice discuss money, but did not learn of the circumstances of that conversation until after the controlled buy. Agent Harley did not know until May 4, two days after the search warrant was executed, that the recording of the controlled buy was

inaudible. During the controlled buy, Officer Bryant-Smith was positioned outside building F so she could see the door to apartment F-19.

After the controlled buy, Chambers told Agent Harley that a man named John opened the apartment door. Chambers had seen John before but did not know who he was. Agent Harley asked Chambers if he had ever dealt drugs with John, and Chambers said he had not. Chambers indicated that he gave the money to Defendant Sailor. Chambers had identified Sailor, whom he referred to as "Cuz," from photographs before the controlled buy. Chambers said that Sailor had 17 or 18 ounces of cocaine in a box in his kitchen. Chambers also said he had seen Sailor with a firearm at the apartment within the last year.

After debriefing Chambers, Agent Harley left to prepare his affidavit. Thus, Agent Harley did not know John's last name or whether he had a prior drug conviction when he signed the affidavit. While preparing the affidavit, Agent Harley learned that Defendant Sailor and another individual had left the apartment, but did not put that fact in his affidavit. Agent Harley explained that he did not mention the individual named John in the affidavit because he did not think John's presence had any bearing on whether drugs would be found in the apartment.

Officer Bryant-Smith testified she had a direct view of apartment F-19 throughout the controlled buy and watched Chambers enter and exit the apartment.

Officer Bryant-Smith did not see either Defendant Sailor or John Austin.  After the controlled buy, Officer Bryant-Smith returned to her car in the parking lot.  About ten or fifteen minutes later, Officer Bryant-Smith saw a gray car drive out of the apartment complex.  The driver fit the description of Defendant Sailor.  Officer Bryant-Smith thought she saw a second person in the car, but was not sure because the windows were tinted.

After the suppression hearing, the district court did agree that some information was omitted from Harley's affidavit.  However, the district court also concluded, inter alia, that: (1) Sailor had not met his burden to prove that Agent Harley's affidavit contained any false statements or omissions essential to the finding of probable cause, and (2) that, in light of all the circumstances stated in Agent Harley's affidavit, probable cause existed for the search warrant.

**E.    Trial and Sentences**

After trial, the jury found Sailor guilty of conspiracy to possess with intent to distribute less than 500 grams of cocaine and less than 5 grams of cocaine base (Count 1), possession with intent to distribute 500 grams or more of cocaine and 5 grams or more of cocaine base (Count 3) and possession of a firearm or ammunition by a convicted felon (Count 5), but not guilty of distribution of cocaine (Count 2) and possession of a firearm during a drug trafficking crime

8

(Count 4).[4]  At sentencing, the district court calculated an advisory guidelines range of 360 months' to life imprisonment and imposed concurrent 360-month sentences on the three convictions.  Sailor filed this appeal.

## II.  MOTION TO SUPPRESS

### A.    Probable Cause

Sailor argues that the district court erred in denying his motion to suppress because Agent Harley's affidavit supporting the search warrant contained intentional and reckless misrepresentations and omissions that were essential to the probable cause finding.  See Franks v. Delaware, 438 U.S. 154, 155-56, 98 S. Ct. 2674, 2676 (1978).

Probable cause to support a search warrant exists when the totality of the circumstances indicates "there is a fair probability that contraband or evidence of a crime will be found in a particular place."  Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332 (1983).  To establish probable cause, an affidavit submitted to obtain a search warrant must state facts that are "sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002) (quotation marks omitted).  This standard does not require certainty, but rather "a fair probability."

---

[4]The jury found drug quantities lower than those charged in the indictment and, thus, convicted Sailor of lesser-included offenses.

See id. It is sufficient if the affidavit "establish[es] a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." Id.

If a defendant demonstrates by a preponderance of the evidence that an affidavit used to obtain a search warrant contains intentionally or recklessly made false statements or omissions that were essential to a finding of probable cause, the district court must void the search warrant and exclude the fruits of the search. United States v. Novaton, 271 F.3d 968, 986 (11th Cir. 2001) (citing Franks, 438 U.S. at 156, 98 S. Ct. at 2676); United States v. Anderton, 136 F.3d 747, 749 (11th Cir. 1998); Madiwale v. Savaiko, 117 F.3d 1321, 1326-27 (11th Cir. 1997). The defendant "must show not only that misrepresentations or omissions were intentionally or recklessly made, but also that, absent those misrepresentations or omissions, probable cause would have been lacking." Novaton, 271 F.3d at 987. Thus, omissions and misrepresentations that are negligent or immaterial to the probable cause determination will not invalidate a search warrant. See id.; Madiwale, 117 F.3d at 1327.[5]

**B.     Discussion**

---

[5]We review the district court's determination that an affidavit established probable cause de novo and the district court's findings of fact for clear error. United States v. Jiminez, 224 F.3d 1243, 1248 (11th Cir. 2000).

We conclude that Defendant Sailor did not carry his burden to show that Agent Harley's affidavit contained intentional or reckless misrepresentations or omissions that were essential to a probable cause finding. As to misrepresentations, Sailor points to several statements in quotation marks that he claims are false, but which do not appear in Agent Harley's affidavit at all. For example, Agent Harley did not aver that agents "watched the informant enter the above-described premises and shortly emerge therefrom" or that "confidential informant stated that additional quantities of the substances were observed on the premises." Instead, Agent Harley's affidavit states that agents observed the CS "exiting his/her vehicle and walking toward the F building" and, a few minutes later, "exiting apartment F-19."[6] Agent Harley's affidavit also states that while being debriefed, the CS "stated that Sailor possessed a box in the kitchen of the target residence containing approximately 17 or 18 ounces of cocaine." Sailor presented no evidence at the suppression hearing that either of these statements is false. Indeed, the testimony of Agent Harley and Officer Bryant-Smith corroborated these statements.

---

[6]Sailor's appellate brief incorrectly states that Agent Harley averred that he observed the CS enter the building. Agent Harley's affidavit states that agents observed the CS "walking toward" the building. There is no evidence this statement is false. Although Agent Harley omitted from his affidavit that one agent, Officer Bryant-Smith, saw the CS enter apartment F-19, this omission appears to have been an oversight given that this fact helps rather than hurts the case for probable cause. In any event, even without this fact, the affidavit establishes a "fair probability" that drugs and drug trafficking paraphernalia would be found inside the apartment.

Likewise, Sailor contends that Agent Harley averred that "before the informant entered the above-described premises, your affiant searched the informant and determined that the informant was not in possession of any controlled substance." This statement cannot be found in Agent Harley's affidavit. Instead, Agent Harley's affidavit states that before the controlled buy the CS "had [ ] been searched for illegal contraband by law enforcement officers with negative results."

Sailor argues that "agents may have conducted a 'pat down' search," but that "there is no evidence that the agents searched the private regions or underwear to determine if any contraband had been concealed prior to the controlled purchase." Sailor's argument misapprehends the burden of proof. Agent Harley's affidavit is presumed valid. See Franks, 438 U.S. at 171, 98 S. Ct. at 2684. And, Sailor had the burden to show that Agent Harley's statement that the CS was searched for drugs was false or misleading. See Novaton, 271 F.3d at 986-87. Sailor did not satisfy this burden.[7]

As for omissions, Sailor complains that Agent Harley's affidavit failed to provide any information about the CS's past reliability or veracity or that the CS

_____

[7]Sailor claims that Agent Harley testified at the suppression hearing that the search performed on the CS was "cursory." However, the portion of Agent Harley's testimony Sailor cites does not address the search of the CS, let alone describe it as cursory. In fact, Sailor's counsel did not ask Agent Harley about the search of the CS at any point during the hearing.

12

was facing drug charges. Agent Harley explained that he had never used Chambers, the CS, as a source. Thus, Agent Harley could not have included information about Chambers' past reliability. Furthermore, Agent Harley did not need to demonstrate Chambers' reliability because there was sufficient police surveillance of the circumstances surrounding the controlled buy and sufficient independent corroboration of Chamber's information. See Martin, 297 F.3d at 1314.

Under the totality of the circumstances, there was sufficient information in Agent Harley's affidavit to determine that there was a fair probability that drugs would be found inside apartment F-19. The task force investigators conducting the controlled buy continuously followed Chambers to the apartment complex, observed Chambers walk toward building F and, a few minutes later, exit apartment F-19. Agents continuously followed Chambers to a neutral location, where Chambers turned over cocaine and cocaine base. Investigators also independently verified that the apartment was leased to Sailor. This information established a connection between Sailor and the apartment to be searched and a link between the apartment and the criminal activity. See id. Thus, this information in the affidavit, even absent any information about the CS, provided a sufficient basis for finding that probable cause to search the apartment existed.

13

Sailor contends that Agent Harley omitted the fact that Chambers was "unaccounted for" for a period of time "with no visual corroboration by law enforcement." Presumably, Sailor is referring to the period of time Chambers was inside apartment F-19. This is not a fact Agent Harley omitted from his affidavit. As already discussed, Agent Harley stated that Chambers was observed walking towards building F and then exiting apartment F-19 a few minutes later. A common sense reading of this statement would be that agents did not see Chambers while he was inside the apartment.

Finally Sailor complains that Agent Harley omitted the fact that Chambers encountered John Austin during the controlled buy. As the district court pointed out, the fact that a third person was present during the controlled buy is immaterial to the question of whether drugs would be found in the apartment. The key is Agent Harley had a reasonable belief that Chambers made the controlled buy in the residence leased to Defendant Sailor. Further, there was evidence that Chambers was in contact with Sailor before the buy and no evidence Chambers was in contact with Austin.

In sum, we conclude that: (1) Sailor has not shown any omissions or misrepresentations in Agent Harley's affidavit that would invalidate the search warrant; and (2) Agent Harley's affidavit amply established probable cause for the

14

search warrant.  Accordingly, the district court properly denied Sailor's motion to suppress.

### III.  SUFFICIENCY OF THE EVIDENCE

Defendant Sailor also challenges the sufficiency of the evidence to support the jury's verdict, and, thus, we review the trial evidence, which was more detailed than the evidence presented at the suppression hearing.

**A.    Trial Evidence**

Five task force investigators testified about the circumstances of the controlled buy at Sailor's apartment, Sailor's arrest and the search of Sailor's apartment.  On April 27, 2007, the task force conducted a controlled buy using a confidential source named Deante Hinson.  Hinson drove with Chambers to the apartment complex on 1834 Jackson Bluff Road and parked on the south side of building F.  While Hinson remained in the car, Chambers got out and later returned with an ounce of cocaine.  Chambers was subsequently arrested and agreed to cooperate with the task force.

Chambers told investigators that Sailor was his main source of supply.  On May 2, 2007, Chambers called Sailor and set up a cocaine transaction.  The call was recorded, and the recording was received into evidence.  Chambers was then equipped with an electronic listening device so investigators could monitor the

conversation between Sailor and Chambers. Investigators also used a recording device, but discovered on May 4 that the device had not worked. Before the transaction, investigators searched Chambers and his vehicle and gave Chambers $1,000 in recorded bills.

Hinson, still working as a CS, drove Chambers to the apartment complex on 1834 Jackson Bluff Road, with investigators continuously following them. Hinson and Chambers parked near F building. Numerous agents were set up around the apartment complex. Officer Bryant-Smith was stationed on foot inside the courtyard area of F building and, at about 2:56 p.m., saw Chambers walk up the stairs and knock on the door of apartment F-19.

Agent Harley and Officer Donato listened on the monitoring equipment in a nearby car. Agent Harley heard a male greet Chambers when he entered the apartment, and a female voice that sounded "staticky," like it was coming from a speaker phone. Agent Harley heard comments consistent with a drug deal, such as "This is it. How much?" Agent Harley also thought he heard Chambers ask about a "piece" referring to a piece of crack cocaine. Officer Donato heard a knock at the door at 2:56 p.m., the door open at 2:57 p.m., a male and a female, who sounded like she was on a speaker phone, arguing over money and a brief exchange between two males that was essentially, "Here you go." Chambers was inside the

16

apartment for about four minutes when Officer Bryant-Smith saw him exit the apartment at 3:00 p.m. and walk down the stairs.

After leaving apartment F-19, Chambers returned to Hinson's car, and they drove to a neutral location with investigators continuously following them. At the neutral location, Chambers turned over 28.3 grams of cocaine and 1.4 grams of crack cocaine and $100 of the $1,000 he was given to make the buy. Chambers told investigators that another person named John was in apartment F-19, but he did not know John's last name. It was later determined that the man was John Franklin Austin.

After the controlled buy, at about 3:30 p.m., several investigators followed Sailor and another individual as they drove away from F building in a gray Buick Skylark. Sailor pulled into the driveway of a residence that was later connected to Austin. When Sailor pulled out, he was alone in the car. At about 4:00 p.m., investigators conducted a traffic stop and arrested Sailor. Investigators removed from Sailor's pockets two cell phones, a small bag of marijuana and $1,764 in cash, $900 of which were the recorded bills from the controlled buy. Sailor also had keys that opened the front door and the master bedroom of apartment F-19, both of which had deadbolts.

In the Skylark, investigators found two more cell phones, one of which had the telephone number Chambers provided for Sailor. Telephone records showed that Chambers had called this cell phone number on April 27, 2007, the day Chambers sold cocaine to Hinson in the apartment complex parking lot. This was also the cell phone number Chambers called on May 2, 2007 to arrange the cocaine transaction with Sailor.

At about 6:00 p.m., investigators searched apartment F-19 and found in the master bedroom: (1) two duct-taped packages containing kilograms of cocaine; (2) a picture of Sailor on the night stand; (3) clothing, consistent with Sailor's build, and shoes; (4) a pan with a surgical mask and cocaine residue; (5) a ballistic vest; (6) a loaded, Ruger nine-millimeter handgun; and (7) $10,980 in thousand-dollar stacks. Investigators found a bed propped against a wall in a second bedroom, which appeared uninhabited. In the kitchen, investigators found: (1) three plastic baggies containing cocaine; (2) electronic scales; (3) rubber gloves; (4) surgical masks; (5) a bag of crack cocaine; (6) a pot and beakers used to cook crack cocaine; (7) a spoon with cocaine residue on it; (8) baking soda, which is an ingredient used to cook crack cocaine; (9) sandwich bags and "smaller Ziploc baggies," and (10) nine-millimeter ammunition. Investigators found an unloaded, Beretta nine-millimeter handgun under the couch cushion in the living room.

18

An FDLE crime laboratory analyst testified that none of the fingerprints on the plastic bags found in Sailor's apartment matched Sailor, Austin or Chambers. The government introduced a report by an ATF examiner that no fingerprints of value were found on the firearms recovered from the apartment and that the surfaces of the firearms were not conducive to leaving prints.

The government introduced: (1) a lease agreement for apartment F-19, naming Daniel Clayton and Sailor as lessees, beginning on February 21, 2006, and ending on July 31, 2007, (2) a lease agreement for apartment E-1, naming Sailor as lessee, beginning March 25, 2005, and ending July 31, 2006, (3) Sailor's Florida driver's license, listing his address as 1834 Jackson Bluff Road, apartment F-19, Tallahassee, Florida, (4) utility records showing that Sailor was responsible for paying the utility bills at apartment F-19 from October 12, 2006, to May 15, 2007; and (5) a docket report showing that Clayton was in jail from at least February 6, 2007, to May 20, 2007.

Chambers, who was Sailor's co-defendant on the conspiracy charge, testified about his past drug dealing history with Sailor and the May 2, 2007 controlled buy. According to Chambers, he began buying cocaine from Sailor in August 2005 and for a time "cooked" crack cocaine for Sailor in another apartment in the Jackson Bluff Road apartment complex. Beginning in October or November 2006,

19

Chambers purchased between 7 and 154 grams of cocaine and 1 to 2 grams of crack from Sailor two or three times a week, which he then resold. Starting in February or March of 2007, Chambers started going to apartment F-19 for his purchases from Sailor. Chambers saw Sailor sell drugs to other people in the apartment. Chambers said Sailor used a "doorman" who opened the apartment door to make sure it was someone Sailor was expecting.

Chambers also saw Sailor with two guns, which Sailor said were for protection. Chambers identified the guns seized in the apartment as the guns he saw in Sailor's possession. Chambers also saw Sailor with a bullet proof vest and identified it as the one seized during the search. Chambers explained that Sailor kept notes on who owed him money for cocaine and identified Sailor's handwriting on the ledgers seized in the apartment.

Chambers testified that on May 2, 2007, he called Sailor and set up a purchase. During the controlled buy, Chambers knocked on the apartment door and a man named John answered. John sat down on the sofa and was not involved in the drug deal with Sailor. Chambers followed Sailor into the kitchen, where Chambers asked for "a whole one" and Sailor threw him an ounce of powder cocaine. Chambers saw ounces of cocaine "bagged up" on the kitchen counter. Chambers paid Sailor $800 for the powder cocaine and $100 for some crack

cocaine. After Chambers left the apartment, he met up with task force investigators and gave them the drugs.

Nathaniel Franklin, who was indicted on federal drug charges and cooperating with the government, testified that he had bought powder cocaine from Sailor three or four times and had seen Sailor in possession of a firearm and crack cocaine.

Corpus Butler, who was in custody on federal drug charges and was cooperating with the government, testified that he had known Sailor for four or five years. Butler and Sailor became reacquainted while in custody. Sailor told Butler that he had been supplying drugs to many people in the Tallahassee area, that he made about $100,000 a week and that he kept his "strap" on him (which Butler took to mean a gun) because many people owed him money. Sailor said that a man named Jesse had set him up and Sailor was going to try to have him terminated before trial.

Jason Shoates, a federal inmate who came to know Sailor while in custody, testified that Sailor said he made $100,000 a week selling drugs, controlled most of the north side of Tallahassee, and got his drugs from his girlfriend's father in Orlando. Sailor told Shoates that a man named Jesse had set him up and he planned to hurt Jesse to prevent him from testifying at trial.

21

At the close of the government's evidence, Sailor moved for a judgment of acquittal on all counts, which the district court denied.

In the defense case, Sailor testified that he owned a car detailing business and lived with his girlfriend. Sailor said he had re-rented his apartment on Jackson Bluff Road to John Austin and a man named Clayton and had not lived there for six or seven months. Sailor explained that he went to the apartment on May 2, 2007 to collect the rent from Austin. Sailor picked Austin up and drove him to another place, where Austin went inside and returned with Sailor's rent money.

Sailor explained that he knew Chambers because for a long time he thought he and Chambers were cousins and he often lent Chambers money. Sailor said that not he, but Austin talked to Chambers on a cell phone on May 2, 2007. Sailor explained that he had let Austin use one of the cell phones that was found in his pockets when he was arrested.

Sailor denied being a drug dealer or admitting to other inmates that he was a drug dealer. Sailor denied possessing guns, but stated that Clayton had a permit for a gun. Sailor claimed that he had no idea that drugs were in the apartment or that Austin was making crack cocaine in the apartment.

B.    **Discussion**

22

Sailor argues that the government presented insufficient evidence that he had constructive possession of the drugs, firearms and ammunition found in his apartment or that he was a knowing participant in a drug trafficking conspiracy. Sailor argues that the evidence at trial showed only that he was "merely present" at the apartment before the search was conducted.[8]

To establish a § 922(g)(1) violation, the government must prove that a convicted felon knowingly possessed a firearm or ammunition that has affected or was in interstate commerce. 18 U.S.C. § 922(g)(1); United States v. Glover, 431 F.3d 744, 748 (11th Cir. 2005).[9] Similarly, to establish a § 841(a) violation, the government must prove the defendant "knowingly possessed the controlled substance with intent to distribute it." United States v. Hernandez, 433 F.3d 1328, 1333 (11th Cir. 2005) (quotation marks omitted). For both offenses, to satisfy the "knowing" possession requirement, the government must prove either actual or constructive possession. Id. at 1333; Wright, 392 F.3d at 1273. "Constructive possession exists when a defendant has ownership, dominion, or control over an

---

[8]We review the sufficiency of the evidence to support a conviction de novo, "viewing the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." United States v. Wright, 392 F.3d 1269, 1273 (11th Cir. 2004) (quotation marks omitted). A conviction will not be overturned for insufficient evidence unless "the jury could not have found the defendant guilty under any reasonable construction of the evidence." United States. v. Byrd, 403 F.3d 1278, 1288 (11th Cir. 2005) (quotation marks omitted).

[9]At trial, Sailor stipulated that he was a convicted felon and that the firearm affected or was in interstate commerce.

23

object itself or dominion or control over the premises or the vehicle in which the object is concealed." Hernandez, 433 F.3d at 1333 (quotation marks omitted). However, a defendant's "mere presence" in the area of contraband or firearms, alone, is not sufficient to establish possession. United States v. Beckles, 565 F.3d 832, 841 (11th Cir. ), cert. denied, 130 S. Ct. 272 (2009) (firearm); United States v. Thompson, 473 F.3d 1137, 1142 (11th Cir. 2006) (drugs).

To establish a drug conspiracy, the government must prove that the defendant knew of an illicit agreement to possess the drug with the intent to distribute it and, with that knowledge, voluntarily joined the conspiracy. Hernandez, 433 F.3d at 1333. These elements may be proved by circumstantial evidence. United States v. Hernandez, 896 F.2d 513, 518 (11th Cir. 1990). Mere presence or association with co-conspirators is insufficient, without more, to support a conviction for conspiracy to distribute drugs. Id. However, presence is a "material and probative factor which the jury may consider in reaching its decision." Id. (quotation marks omitted).

Here, the government presented ample evidence to support the jury's finding that Sailor constructively possessed the drugs and firearms found in apartment F-19 and knowingly participated in a drug trafficking scheme operated out of the apartment. First, the jury could find that Sailor had dominion and control of

24

apartment F-19 because he leased the apartment, the utilities for the apartment were in his name; the apartment's address was listed on his driver's license, Sailor had keys to the apartment's front door and the master bedroom, and Sailor's personal items were found in the master bedroom. The only other person on the lease, Clayton, was in jail at the time of the May 2, 2007 controlled buy and search. In addition to the drugs and firearms, the apartment contained items used to convert cocaine powder to crack cocaine and to package and sell cocaine on the street, such as scales, pots, pans beakers, plastic baggies, baking soda and ledgers.

In addition, Chambers testified that he visited Sailor numerous times at the apartment to buy drugs, saw Sailor sell drugs to others in the apartment, described Sailor's note-taking system for keeping track of accounts and identified Sailor's handwriting in the ledgers seized at the apartment. Chambers saw Sailor in the apartment with a bullet proof vest and firearms, which Sailor said were for protection. And, Chambers identified the bullet proof vest and firearms seized in the apartment. Consistent with their past history, during the May 2, 2007 controlled buy, Sailor sold Chambers cocaine powder and crack cocaine in the apartment.

Federal inmates Shoates and Butler testified that Sailor admitted that he was a drug dealer and that he provided cocaine to people over a large area of

25

Tallahassee.  Franklin, who was facing drug charges, bought cocaine from Sailor in 2007 and had seen Sailor with a gun.

Although Sailor testified that he had sublet the apartment to Austin and was unaware that drugs were in the apartment, the jury was free to disbelieve Sailor, which it obviously did.  We have no reason to disturb the jury's adverse credibility finding.  See United States v. Williams, 390 F.3d 1319, 1323-34 (11th Cir. 2004) ("All credibility choices must be made in support of the jury's verdict" and the "jury is free to choose among reasonable constructions of the evidence").  Furthermore, Sailor's discredited testimony is substantive evidence of his guilt.  See United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995) ("[A] statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt.").  Construing all of this evidence in the light most favorable to the jury's verdict, the government's evidence was more than sufficient to sustain Sailor's convictions.

## IV.  REASONABLENESS OF SAILOR'S SENTENCES

We review the reasonableness of a sentence for abuse of discretion using a two-step process.  United States v. Pugh, 515 F.3d 1179, 1190 (11th Cir. 2008).  We look first at whether the district court committed any significant procedural error and then at whether the sentence is substantively reasonable under the totality

26

of the circumstances. Id. The party challenging the sentence bears the burden to show it is unreasonable in light of the record and the 18 U.S.C. § 3553(a) factors. United States v. Thomas, 446 F.3d 1348, 1351 (11th Cir. 2006).[10] We ordinarily expect that a sentence within the advisory guidelines range will be reasonable. United States v. Hunt, 526 F.3d 739, 746 (11th Cir. 2008).

At sentencing, the district court heard from Sailor, who discussed his difficult childhood in the "projects," his attempts to improve his life by getting an education and his supportive family. The district court reviewed the PSI, which contained Sailor's extensive criminal history and personal background, as well as the nature and circumstances of the offenses. The district court heard Sailor's argument in mitigation that he had obtained his GED, started college classes and had a job.

The district court also heard the government's arguments as to some of the § 3553(a) factors. The government noted the loaded firearm, the large quantity of drugs and cash, and the body armor found in the apartment and highlighted Sailor's extensive criminal history, which included a conviction for aggravated

---

[10]The § 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims. 18 U.S.C. § 3553(a).

27

battery with a deadly weapon, in which Sailor shot someone four times. The government argued that Sailor was a danger to the public and emphasized the need to deter others, protect the public and promote respect for the law.

The district court stated that it had considered the § 3553(a) factors and the advisory guidelines range and that it had "tailored the sentence to take into account the facts and circumstances surrounding this particular case." After imposing concurrent 360-month sentences, the district court stated that sentences at the low end of the guidelines range were sufficient to serve as a just punishment and to deter others.

We cannot say the district court's concurrent 360-month sentences, at the low end of the advisory guidelines range, were substantively unreasonable.[11] Sailor converted cocaine to crack in his apartment and then sold it to street level dealers. Sailor kept loaded firearms at the apartment as protection, had a bullet proof vest and used a "doorman" to make sure no one entered the apartment that he was not expecting. One of Sailor's many prior convictions involved shooting someone four times. Under the totality of the circumstances, the district court was within its discretion to conclude that the mitigating factors Sailor pointed out were outweighed by the seriousness of Sailor's offenses and the need to protect the

---

[11]Sailor does not argue that his sentence is procedurally unreasonable or identify any procedural sentencing errors.

public and deter others. See United States v. Amedeo, 487 F.3d 823, 832 (11th Cir.) ("The weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court, and we will not substitute our judgment in weighing the relevant factors." (quotation marks omitted)), cert. denied, 128 S. Ct. 671 (2007).

**AFFIRMED.**